**UNITED STATES of America, Appellee,**

v.

**Maximo E. TEJADA–BELTRAN, Alias, etc., Defendant, Appellant.**

**No. 94–1780.**

United States Court of Appeals, First Circuit.

Heard March 6, 1995.

Decided March 31, 1995.

Jose M. Feliciano–Valera, Trujillo Alto, PR, on brief, for appellant.

Guillermo Gil, U.S. Atty., Washington, DC, Jose A. Quiles–Espinosa, Sr. Litigation Counsel, and Jeanette Mercado–Rios, Asst. U.S. Atty., Hato Rey, PR, on brief, for appellee.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

This is another in the ever-lengthening queue of sentencing appeals that have crowded federal appellate dockets since the advent of guideline sentencing. After carefully considering appellant's asseverations, we affirm.

## I. BACKGROUND

Because appellant's conviction and sentence stem from a guilty plea rather than a trial, we derive the pertinent facts from the presentence investigation report (PSI Report) and the transcripts of the change-of-plea and disposition hearings. *See United States v. Dietz,* 950 F.2d 50, 51 (1st Cir.1991).

On September 20, 1993, federal authorities arrested two women, both of whom were citizens of the Dominican Republic, at San Juan's principal international airport.[1] The women had unsuccessfully attempted to gain entry into the United States using ersatz passports. In short order, the authorities determined that defendant-appellant Maximo E. Tejada–Beltran (Tejada) had furnished the bogus documents and had offered to pay a student apprentice employed on a part-time basis by the Immigration and Naturalization Service (INS) $1,000 per head to ensure his clients' unlawful entry.

On September 24, the apprentice arranged a meeting between Tejada and an undercover agent. During the course of this session, appellant offered to pay the agent, who was posing as a corrupt INS inspector, a bounty of $1,000 for each alien who was permitted to sneak into the United States from the Dominican Republic. The men struck a deal. Appellant suggested that the bribes be paid at the inspection booth coincident with the illegal entries and forecast that clients would begin to arrive between September 26 and October 2.

On October 2, appellant spoke with the agent, told him he had scheduled an arrival for the next day, described the traveller, and confirmed that he would be carrying a fraudulent passport made out in an assumed name. Appellant informed the agent that the alien would pay him upon arrival. On October 3, the alien reported to the inspection booth and handed the agent an envelope containing $1,000 in cash. The agent thereupon facilitated the smuggle. That evening, appellant confirmed his client's successful entry and told the agent that his father, who lived in Puerto Rico, would retrieve the fraudulent passport so that it could be recy-

1. All events occurred in 1993 unless otherwise specifically indicated.

cled for future use. He also speculated that, in the future, his father, rather than his clients, might make the payoffs to the agent.

In the weeks that followed, appellant identified a steady stream of clients to the agent, regularly promising to pay him $1,000 for each illegal alien who entered without incident. These arrangements were consummated client by client, on different dates. On each occasion appellant provided the agent with the name and description of the alien or aliens in question, the anticipated arrival date, and a suggested method of payment. For example, on October 7, appellant arranged for the agent to admit two clients bearing resident alien cards that belonged to relatives. The next day, when the aliens gained entry, each of them delivered an envelope containing $1,000 to the agent.[2]

Appellant often boasted about his connections. He told the agent that he had people in Puerto Rico who would pay United States citizens to petition the State Department for passports or kindred documents, and then turn them over to appellant for use in his nefarious scheme. Appellant also bragged about a wide array of quondam accomplices: a person who had access to sophisticated machinery that could be used to alter authentic documents, such as United States passports and alien registration cards, and who would forge documents for him in the Dominican Republic; two immigration inspectors at airports in the Dominican Republic who accepted bribes to assist in the smuggles; a person in New York who would facilitate the illegal immigration of aliens entering the country via New York; and an individual in Miami who, on request, would obtain "secure" ink (supposedly available only to the government) that could then be used to doctor United States passports. In addition to this cadre of confederates, appellant also mentioned that he would from time to time hire attorneys to represent aliens caught in the toils when planned entries went awry.

Between October 16 and November 6, appellant negotiated the illegal entry of at least seven more clients. When, thereafter, appellant told the agent that he wanted two particular aliens admitted, and that he, personally, would pay $2,000 to smooth the way, the INS decided to spring the trap. The authorities arrested appellant on November 16 while he was delivering the $2,000 gratuity to the agent. At the time of his apprehension, arrangements had already been made for the illegal entry of three more aliens (scheduled to arrive later that day).

In a matter of weeks, a federal grand jury handed up a 22–count indictment (summarized in the Appendix). The first ten counts charged appellant with encouraging or inducing specified aliens illegally to enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(D); the next five counts charged appellant with furnishing altered passports to specific aliens to be used to gain admittance into the United States, in violation of 18 U.S.C. § 1543; and the remaining seven counts charged appellant with bribery of a public official, in violation of 18 U.S.C. § 201(b)(1)(C).

After some preliminary skirmishing (not relevant here), appellant pled guilty to four counts of encouraging or inducing aliens illegally to enter the United States (counts 1, 3, 5, 6), three counts of furnishing altered passports (counts 11, 13, 14), and three counts of bribery (counts 16, 17, 18). On June 24, 1994, the district court convened the disposition hearing.[3] Relying for the most part on the findings and recommendations contained in the PSI Report, the court treated the bribery counts as predominant; set the base offense level at 10, see U.S.S.G. §§ 2C1.1, 3D1.3; raised it by two levels because appellant's misconduct involved multiple bribes, see U.S.S.G. § 2C1.1(b)(1); applied an increase of three more levels because the bribes, in the aggregate, had a value in excess of $10,000, see U.S.S.G.

---

2. Notwithstanding the agent's efforts, the authorities arrested one of these men when they discovered he had a prior felony conviction in the United States.

3. A sentencing court customarily applies the guidelines in effect on the date of sentencing.

*See United States v. Bell*, 953 F.2d 6, 7 (1st Cir.1992); *United States v. Harotunian*, 920 F.2d 1040, 1041–42 (1st Cir.1990). Accordingly, this case is governed by the November 1, 1993, edition of the guidelines, and all references in this opinion are to that version.

§§ 2C1.1(b)(2)(A), 2F1.1(b)(1)(D); added four more levels because of appellant's role in the offense, *see* U.S.S.G. § 3B1.1(a); and subtracted three levels for acceptance of responsibility, *see* U.S.S.G. § 3E1.1. The district court then calculated the guideline sentencing range at 21–27 months (offense level 16/criminal history category I); imposed a 27–month incarcerative sentence (accompanied by a three-year term of supervised release and a $500 special assessment); and dismissed the other twelve counts contained in the indictment. This appeal followed.

## II. ANALYSIS

On appeal, Tejada assigns error in two respects.[4] We address his claims *seriatim*.

### A. *Relevant Conduct.*

 Appellant strives to persuade us that the record in this case will not support a finding, by a fair preponderance of the evidence, that the offense of conviction involved bribes totalling more than $10,000. Since this exhortation challenges the sentencing court's findings of fact, our review is for clear error. *See United States v. St. Cyr,* 977 F.2d 698, 701 (1st Cir.1992). We discern none.

 With respect to offenses involving bribery of public officials, the sentencing guidelines use the amount of the bribe offered or given as an important indicium in fixing the defendant's offense level and, hence, the ultimate sentencing range. *See* U.S.S.G. §§ 2C1.1(b)(2)(A); 2F1.1(b)(1). The aggregate amount of the covered bribes is to be derived from the sum total of all relevant conduct—a datum that can be arrived at only after consideration of all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *see generally United States v. Sklar,* 920 F.2d 107, 110 (1st Cir.

1990); *United States v. Blanco,* 888 F.2d 907, 910 (1st Cir.1989). Assembling this compendium requires the sentencing court to consider both consummated and unconsummated bribes. The failure to consummate a bribe neither detracts from the donor's culpability nor renders the amount involved ineligible for use in setting the donor's offense level; the guidelines treat solicitations and attempts as equivalent to completed offenses. *See* U.S.S.G. § 2C1.1(b)(2)(A), comment. (backg'd).

At the disposition hearing, the lower court relied heavily on the PSI Report. It concluded that appellant had offered or given no fewer than twelve bribes, each in the amount of $1,000. At bottom, this conclusion is the product of simple multiplication: the price per alien times the number of aliens smuggled.

As to the first integer, the court could plausibly have found the price to be $1,000, per head. After all, the record indicates that appellant offered to pay the apprentice $1,000 apiece for the first two aliens admitted, and that he had an ongoing agreement with the undercover agent to pay the same price. These facts adequately ground an inference that appellant offered or gave a $1,000 bribe for each client whom he endeavored to smuggle into the United States.

 By like token, the court could plausibly have found that no fewer than twelve aliens were involved. The court identified the aliens it had in mind by reference to particular incidents, citing the five client arrivals that undergirded counts 1 through 5, all of which occurred between September 20 and October 8, and "at least seven" additional arrivals occurring between October 16 and the first week in November.[5] Appellant would have us draw the line at those aliens

---

4. In the district court, appellant also argued that each of the bribery counts represented installment payments referable to a single bribe, and, hence, could not carry the weight of a two-level increase under U.S.S.G. § 2C1.1(b)(1). The court below rejected this argument, and appellant has not renewed it on appeal. Thus, we deem it to be waived. *See United States v. Slade,* 980 F.2d 27, 30 n. 3 (1st Cir.1992); *United States v. St. Cyr,* 977 F.2d 698, 701 (1st Cir.1992).

5. Tejada asserts for the first time on appeal that only five illegal aliens entered between October 16 and November 6. Because he did not advance this assertion below, he has waived any right to raise the issue on appeal. *See Dietz,* 950 F.2d at 55. At any rate, the assertion lacks force. It fails to recognize that, in determining relevant conduct, the judge could—and did—go beyond the incidents described in the indictment.

specified in the counts of conviction, but this approach misperceives the method of the guidelines. Relevant conduct is not limited to the counts of conviction. It may include acts that were embodied in counts originally charged but later dropped, *see, e.g., United States v. Garcia*, 954 F.2d 12, 15 (1st Cir. 1992), and acts that were never charged at all, *see* U.S.S.G. § 1B1.3, comment. (backg'd). For present purposes, this means that the sentencing court, in fashioning the three-level enhancement under section 2C1.1(b)(2)(A), could appropriately aggregate all bribes offered or given by appellant as part of the same course of conduct as the offense of conviction, whether or not charged in the indictment and whether or not encompassed by his guilty plea.

This gets the grease from the goose. On this record, the sentencing court could certainly have included the ten aliens mentioned in the indictment (including those aliens who were mentioned in counts that were eventually dismissed). Although appellant argues that the first two incidents, in which he dealt with the student apprentice rather than the undercover agent, were outside the scope of relevant conduct, and, hence, not properly includable, we believe that the court below had ample room to reach the opposite conclusion. Because the apprentice introduced Tejada to the undercover agent, we think that the court could rationally have viewed the serial bribes as part of a single scheme and aggregated all the entries under the relevant conduct rubric.

Over and above these ten, the court also enumerated two other aliens for whose entry appellant negotiated with the undercover agent during the period from October 16 through November 6. While these persons were not named in the indictment, the PSI Report and the audiotapes of appellant's conversations with the agent adequately support their inclusion. No more is exigible. *See United States v. Gonzalez–Vazquez*, 34 F.3d 19, 25 (1st Cir.1994) (explaining that "[f]acts contained in a presentence report ordinarily are considered reliable evidence for sentencing purposes"); *United States v. Morillo*, 8 F.3d 864, 872 (1st Cir.1993) (same). If more were needed to bell the cat, appellant was in the process of delivering a $2,000 bribe at the time of his arrest, and had three more smuggles in the offing. Though these entries were not in fact accomplished, they could nonetheless be counted in determining relevant conduct.

A sentencing court "need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, comment. (n.8). Measured by this yardstick, the court below had a sound basis both for concluding that appellant attempted to facilitate the illegal entries of at least twelve aliens, and for multiplying that number of aliens by $1,000 per head to obtain the overall amount of the bribes offered or given during the course of the scheme. Even if the record, read generously to appellant, might conceivably support some less damning scenario—and we do not suggest that it can—we would not meddle. Our review is only for clear error—and "where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous." *United States v. Ruiz*, 905 F.2d 499, 508 (1st Cir.1990).

### B. *Role in the Offense.*

■ U.S.S.G. § 3B1.1(a) provides for elevating the offense level of "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" by four levels. The district court seized upon this guideline and hiked appellant's offense level on the theory that he was the organizer of an extensive criminal enterprise. Appellant assigns error because, in his view, the record fails to disclose that he exercised any degree of control over others, that he brought others together for the purpose of carrying out the crime, or that the criminal activity encompassed five or more participants.

Assessing a defendant's role in the offense is a fact-specific task, suggesting by its very nature "that considerable respect be paid to the views of the nisi prius court." *United States v. McDowell*, 918 F.2d 1004, 1011 (1st Cir.1990) (quoting *United States v. Ocasio*, 914 F.2d 330, 333 (1st Cir.1990)). It follows, therefore, that unless a mistake of law

looms—and we see none here—a sentencing court's determination of a defendant's role will be set aside only for clear error. *See id.*

In order to invoke section 3B1.1(a), a district court must make both a status determination—a finding that the defendant acted as an organizer or leader of the criminal activity—and a scope determination—a finding that the criminal activity met either the numerosity or the extensiveness benchmarks established by the guideline. *See McDowell,* 918 F.2d at 1011; *United States v. Preakos,* 907 F.2d 7, 9–10 (1st Cir.1990) (per curiam). Tejada's case easily passes both aspects of the test.

1. **Status.** Although the sentencing guidelines do not specifically define the term "organizer" as used in section 3B1.1, the commentary supplies a valuable clue. It tells courts that "[t]his adjustment is included primarily because of concerns about relative responsibility." U.S.S.G. § 3B1.1, comment. (backg'd); *see generally United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989). Because the Sentencing Commission envisions large-scale criminal activities as hierarchical, the guidelines punish the persons atop the pyramid more severely based on their relative responsibility.

To aid in the process of distinguishing top-echelon roles from other, less culpable, managerial or supervisory roles, the Commission directs judges' attention to seven factors including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. (backg'd). This list is intended to be representative rather than exhaustive. *See, e.g., United States v. Talladino,* 38 F.3d 1255, 1260 (1st Cir.1994) (explaining that the seven telltales identified in the Commission's commentary, while useful as guideposts, do not possess "talismanic sig-

nificance"). There need not be proof of each and every factor before a defendant can be termed an organizer or leader. *See Preakos,* 907 F.2d at 9; *see also United States v. Rodriguez Alvarado,* 985 F.2d 15, 20 (1st Cir.1993) (illustrating that a court appropriately may enhance a defendant's offense level under § 3B1.1(a) or (b) despite the lack of any evidence as to one or more of the listed factors).[6]

Appellant's most touted argument is that he cannot be deemed an organizer because our decision in *United States v. Fuller,* 897 F.2d 1217 (1st Cir.1990), requires a finding of the exercise of some degree of control over other individuals before a defendant becomes eligible for any of the aggravating role adjustments described in section 3B1.1. But appellant reads *Fuller* through rose-colored spectacles. There, the defendant contended that he should not have received an upward role-in-the-offense adjustment because the government adduced no proof that he recruited anyone to assist him with his criminal activities, or that he directed other persons in carrying out criminal activities. *See Fuller,* 897 F.2d at 1219. We vacated Fuller's sentence, concluding that

> in the absence of any evidence that Fuller exercised control over [other] persons *or was otherwise responsible for organizing them in the commission of the offense,* the mere fact that Fuller had dealt with a large quantity of marijuana does not support a finding that he was an organizer, leader, supervisor, or manager.

*Id.* at 1221 (emphasis supplied). Thus, *Fuller,* properly read, stands for the proposition that section 3B1.1 "does not apply to a defendant who merely organizes or supervises criminal activity *that is executed without the aid of others.*" *Id.* at 1220 (emphasis supplied); *see also Rodriguez Alvarado,* 985 F.2d at 20 (holding that the sentencing court did not err when it enhanced appellant's sentence as a "manager or supervisor" based on his role in planning and organizing a criminal scheme involving others, despite the absence of any finding concerning appellant's

6. In *Rodriguez Alvarado,* the district court enhanced the defendant's sentence although only three of the seven factors (recruitment of accom-

plices, a substantial role in planning the crime, and the extensive scope of the illegal activity) were present.

control over underlings or subordinates); *see generally* U.S.S.G. § 3B1.1, comment. (n.2) (explaining that an upward adjustment under § 3B1.1 requires that "the defendant must have been the organizer, leader, manager, or supervisor *of one or more other participants*") (emphasis supplied). Thus, *Fuller* does not help appellant; his crimes were not—and could not have been—committed without the complicity of others.

*Fuller* aside, appellant posits that control over a minimum of four others (bringing the total number of criminally culpable participants, including the defendant, to five) is a *sine qua non* for a finding that a particular person is an organizer within the ambit of section 3B1.1(a). In mounting this steed, appellant in effect treats the terms "organizer" and "leader" as synonymous, or, at the least, as functionally equivalent. This lack of precision is arguably to his advantage because some courts have required the exercise of direct control over others as an attribute of leadership status.[7] In the final analysis, however, the terms cannot be casually conflated. The language of section 3B1.1(a) is disjunctive. The guideline demands the four-level increase so long as the defendant is *either* "an organizer *or* leader." [Emphasis supplied].

■ This disjunctive usage cannot be written off as linguistic happenstance. We can only assume that the Sentencing Commission used both words—"organizer" and "leader"—because it knew that they had distinct and disparate meanings. While the term "leader" implies the exercise of some degree of dominance or power in a hierarchy, and also implies the authority to ensure that other persons will heed commands—by definition, one cannot lead if no one follows—the term "organizer" has a different connotation. One may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity. *See Rodriguez Alvarado*, 985 F.2d at 20 (finding enhancement warranted where "appellant played an important role in planning and organizing the offense"); *accord United States v. Varela*, 993 F.2d 686, 691 (9th Cir.) ("An enhancement may be proper where ... a defendant organizes others in the commission of the criminal activity even though he does not retain a supervisory role over the other participants."), *cert. denied*, —— U.S. ——, 114 S.Ct. 232, 126 L.Ed.2d 186 (1993); *United States v. Harry*, 960 F.2d 51, 54 (8th Cir. 1992) ("[D]efendant need not have directly controlled others in the organization to have functioned as an organizer."). The key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility. *Cf., e.g., United States v. Skinner*, 986 F.2d 1091, 1097–98 (7th Cir. 1993) (suggesting that in reviewing aggravating role enhancements, an appellate court's principal focus must be on relative responsibility rather than upon any one of the seven Commission-identified factors). When, as now, the organizer stages an extensive activity in such a way as to evince an increased degree of relative responsibility, the four-level enhancement applies whether or not he retains supervisory control over the other participants. *See Varela*, 993 F.2d at 691–92 (explaining that "[t]he enhancement reflects the greater level of culpability of the participant who arranges the transaction"); *see also Rodriguez Alvarado*, 985 F.2d at 20 (finding enhancement warranted when the defendant's activities "entailed an increased

---

7. While a defendant may be classified as an "organizer" under section 3B1.1(a) even if he did not personally control other participants in an "extensive" criminal enterprise, *see text infra*, some courts have held that a defendant may not receive a § 3B1.1(a) enhancement as a "leader" unless he personally controls at least four other participants or the criminal activity is found to be "otherwise extensive." *See United States v. Carson*, 9 F.3d 576, 584 (7th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994); *United States v. Reid*, 911 F.2d 1456,

1465 n. 8 (10th Cir.1990), *cert. denied*, 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991). It remains an open question in this circuit as to whether a defendant must personally control a bare minimum of four other participants in order to receive a section 3B1.1(a) enhancement as a "leader" of criminal activity involving five or more participants, or whether the two determinations—leadership status and minimum number of participants—are made independently of one another. *See, e.g., United States v. Dota*, 33 F.3d 1179, 1189 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1432, 131 L.Ed.2d 313 (1995).

degree of responsibility for the commission of the offense").

In this instance, we think it is nose-on-the-face plain that the sentencing court did not err in ranking appellant as an organizer. The record attests, directly or by fair inference, that appellant orchestrated the entire scheme, played a pivotal role in committing the crimes, made decisions about when and where unlawful entries would be attempted, recruited accomplices, and retained a degree of control over at least one of them (the document retriever). Viewed from any angle, he bears significant responsibility for the scheme.[8]

█ We hold that retention of control over other participants, although sometimes relevant to an inquiry into the status of a putative organizer, is not an essential attribute of organizer status. Because an organizer is at bottom a person who forms diverse elements into a whole consisting of interdependent, coordinated parts, geared for concerted action, see, e.g., The Random House Dictionary of the English Language 1365 (2d ed. 1987), supervisory control lacks decretory significance. Here, appellant acted as the very prototype of an organizer, serving as a magnet to bring others together and thereby lend feasibility to the commission of the crime. Hence, notwithstanding the lack of any proof that he exercised direct supervision over his confederates, his behavior satisfies the first prong of the test.

█ 2. **Scope.** The test's remaining prong is also fulfilled. In the first place, the district court's determination that the criminal enterprise was "extensive" is solidly anchored in the record: the breadth of the activities, whether measured in terms of duration, number of clients, or geographic reach, argues persuasively to this end. See Dietz, 950 F.2d at 53 (emphasizing importance of "width, breadth, scope, complexity, and duration of the scheme"). Since the criminal activity must meet either the extensiveness or the numerosity benchmark, not necessarily both, a founded finding of extensiveness, in and of itself, is enough to engage the gears of section 3B1.1(a) even if the commission of the crime depended upon fewer than five participants. See id.

█ In any event, the numerosity requirement is satisfied. Although the district court did not name the other participants, that omission is not fatal. It is not necessary that the government prove the identities of the persons whom the organizer organizes as long as the record permits the sentencing court to make "a specific finding, based on a preponderance of the evidence, which pinpoints [the participants] with enough particularity to give credence to the upward adjustment." McDowell, 918 F.2d at 1011. The court here made such a finding, and it is well supported.

█ Taking its cue from the PSI Report, and relying heavily on appellant's boasts to the undercover agent, the sentencing court listed no fewer than ten persons who participated in the scheme. Though the inclusion of some of these persons may be problematic, a goodly number clearly qualify: appellant himself;[9] the individuals who recruited passport applicants; the forger; the person who retrieved the bogus documents after they had been used; and the two immigration inspectors in the Dominican Republic, to name a few. Since the number of criminally culpable participants is at least five, the district court did not err in increasing appellant's offense level.

### III. CONCLUSION

We need go no further. For the reasons stated, the defendant's conviction and sentence must be

***Affirmed.***

---

Tejada's case does not require us to answer this question.

8. Indeed, at the disposition hearing, appellant freely admitted that he alone was responsible for the "planning, coordinating, and executing" of the scheme, the recruitment of aliens, and the supply of documents to them. In light of this admission, the district court aptly stated that "all these people independently would not have produced a successful ... enterprise unless somebody was organizing the whole...."

9. The defendant himself can be counted as a participant for purposes of the numerosity requirement. See Preakos, 907 F.2d at 10.

114

APPENDIX

| Counts | Approximate Date of Offense | Identity of Alien |
|---|---|---|
| 1, 11 | 9/20/93 | Marisol Martinez, a/k/a Lorraine Mercedes |
| 2, 12 | 9/20/93 | Zoila Cruz, a/k/a Lisa Soto |
| 3, 13, 16 | 10/3/93 | John Doe, a/k/a Edwin Ramirez Barreto |
| 4, 17 | 10/8/93 | Jose Eduardo Espinal |
| 5, 18 | 10/8/93 | John Doe, a/k/a Leoncio Collado |
| 6, 19 | 10/16/93 | John Doe, a/k/a Jose Ramon Cruz, a/k/a Jose Ramon Cruz Nunez |
| 7, 14, 20 | 10/21/93 | Jane Doe, a/k/a Elena Guerrero |
| 8 | 10/31/93 | Fernando Antonio Polanco, a/k/a Marco Antonio Vasquez Ramos |
| 9, 21 | 11/2/93 | John Doe, a/k/a Jose Rodriguez Lopez, a/k/a Marcos Antonio Vasquez Ramos |
| 10, 15, 22 | 11/6/93 | John Doe, a/k/a Jose Alberto Gonzalez, a/k/a Jose Alberto Morales |

Note: counts 1–10 charge violations of 8 U.S.C. § 1324(a)(1)(D); counts 11–15 charge violations of 18 U.S.C. § 1543; and counts 16–22 charge violations of 18 U.S.C. § 201(b)(1)(C).