UNITED STATES of America,

v.

Alfredo RIBOT, Defendant.

No. CRIM. 98–10061–NG.

United States District Court, D. Massachusetts.

March 19, 1999.

Diana L. Maldonado, Federal Defender Office, Boston, MA, Alan S. Fanger, Needham, MA, for defendant.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. INTRODUCTION

On February 25, 1998, a four count indictment was returned by a federal grand jury charging Alfredo Ribot ("Ribot") with embezzlement in violation of 18 U.S.C. § 666(a)(1)(A) and 18 U.S.C. § 2 (Court 1), and with income tax evasion in violation of 26 U.S.C. § 7201 (Counts 2–4). The embezzlement charge alleges that Ribot wrongfully took $193,092 while working as on-site manager of Marcus Garvey Apartments ("MGA"), employed by Cornu Management Corporation, Inc. ("Cornu"). The income tax evasion charges allege that Ribot failed to report all of the additional income he gained from the embezzlement scheme.

Ribot has been cooperative from the outset. He immediately surrendered himself, and was released on an unsecured bond. Within less than six months, he pled guilty to all four counts of the indictment.

A sentencing hearing was held over two days. The sentence was as follows: Ribot was placed on probation for thirty-six months, six months of which was in home detention with electronic monitoring. In addition, as an express condition of probation, Ribot was ordered to participate in both a substance abuse, and a mental health program, as selected by the United States probation office.[1] As the discussion below suggests, the Court strongly recommended that Ribot continue in the same psychiatric counseling program in which he was then participating, apparently with success.

The sentencing raises several questions about the interpretation of the applicable Sentencing Guidelines, as well as to whether the Guidelines, as applied, are appropriate in the case at bar: (1) How much money did Ribot take?; (2) how to characterize Ribot's role in the offense—specifically, as supervisor or manager of five or more participants, or a lower echelon leader?; (3) whether, in committing the offense, Ribot abused a position of trust?; (4) whether there should be a departure from the Guidelines because of Ribot's diminished mental capacity?; and (5) whether there should be a departure because this offense is aberrant in Ribot's otherwise exemplary life?

In order to interpret the Guidelines and apply them to the case at bar (Questions 1–3, above), the Court is obliged to look carefully at the facts that the Guidelines have made relevant, chiefly facts pertaining to the offense. But the evaluation of the appropriateness of the application of the Guidelines to Ribot—the question of whether to depart from the Guidelines—requires a broader review, not merely facts made relevant by the Guidelines, but all relevant sentencing facts.[2]

---

1. As an additional condition of probation, Ribot was ordered to pay restitution of $193,092 to Cornu.

2. Recognizing the limitations of a guideline approach to all of the vagaries of a sentencing decision, departures were explicitly authorized by the Sentencing Reform Act if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). As the Supreme Court noted in *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), while the Guidelines provide uniformity, predictability

and detachment, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensure." 518 U.S. at 113, 116 S.Ct. 2035. The Supreme Court in *Koon*, directed the district court to "make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing." *Id.* at 98, 116 S.Ct. 2035.

Plainly, in order to make a departure determination, the Court must have a perspective

I begin with Ribot's background, analyze the offense, and then determine the Guidelines and departure issues.

## II. BACKGROUND

### A. *Family, Education, Community Contributions*

One of eight children, Ribot was raised in poverty, with an extremely abusive and violent father. A few examples should put this abuse in sharp focus: Ribot, then age eight, and one of his brothers were playing in the bathtub in their apartment in the Father Panik Housing Project, in Bridgeport, Connecticut. Angered by the noise the boys were making, their drunken father slammed Ribot's head into the side of the tub and kept it under water, while the young boy struggled to breathe. Ribot nearly drowned; he spent three to four days at St. Vincent's Hospital in Bridgeport, where his stomach was pumped in order to save his life.

On another occasion, Ribot was sitting on the third floor windowsill of the kitchen of the family apartment, with his back to the outside. The open window had no screen or safety bars. Again drunk, Ribot's father pushed him out of the window. Ribot fell three stories, landing—luckily—in a hedge. Not content with his efforts to kill his child, his father came downstairs and proceeded to pummel Ribot.

When his father was not abusing the children, he physically and mentally abused their mother, Aurea. The boys came to sleep on the floor in front of their parents' bedroom door in order to prevent their father's entry, or at the very least, to warn their mother of his approach. When Ribot was thirteen, he and his brother called the police for the last time, finally facilitating the father's departure from the family's home.[3]

Notwithstanding this beginning, Ribot became a school and community leader, as the countless letters and newspaper articles that the Court has received attest. At age seventeen, he became the first chairman of the East Side Neighborhood Council in Bridgeport. At age nineteen, he ran for, and was elected president of his high school class. After high school, Ribot went to college at Sacred Heart University in Connecticut. His high school teachers funded a scholarship to assist with his tuition. Even while he was in school, Ribot supported his family with the jobs he obtained.

Significantly, Ribot not only took on responsibility for his family, but for the greater community. For example, "being a responsible and energetic participant in the War on Poverty," the United States Peace Corps selected Ribot as one of only seven national winners of the Sargent Shriver Scholarship; Ribot spent three months in India, and later served as a volunteer in the Peace Corps in El Salvador.

independent of the Guidelines—*all* the facts the case involves, and not just those facts made relevant by the Guidelines. Thus, 18 U.S.C. § 3553(a)(1) directs that the Court, "in determining the particular sentence to be imposed, shall consider—(1) the nature and circumstances of the offense and the history and characteristics of the defendant." Likewise, 18 U.S.C. § 3661, which was codified along with the Sentencing Reform Act, encourages a broader review. It states: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence:" 18 U.S.C. § 3661. And the Commission itself directed that, when considering a departure from a Guidelines prescribed sentence, "the court may consider, without limitation, any information concerning the background, character, and conduct of the defendant." U.S.S.G. § 1B1.4.

3. The abuse did not stop when Ribot's father moved out. The presentence report narrates his father's efforts to humiliate Ribot, and to demean his efforts to make something of himself. Ribot decided to prove that he would be different from his father, becoming the classic "overachiever," and getting involved in a host of school activities, only some of which are described above.

During the 1970s, Ribot worked tirelessly on behalf of the Hispanic Community in Bridgeport. As director of the Hall Neighborhood House, he provided social services to 5,000 inner city residents. Later, he worked for the city of Bridgeport, monitoring compliance with Equal Employment laws. He became the first Hispanic member of the Bridgeport Board of Education, leading the movement for the incorporation of English as a Second Language, bilingual, and Hispanic culture, into the curriculum. Throughout this time, he continued to work on the Governor's Council on Opportunities for Spanish Speaking Persons.

Ribot also expanded his concerns beyond those of the Hispanic community. He was a member of the Republican Town Committee in Bridgeport and then he was appointed by the Governor to the State Advisory Council on Vocational Education. The Jaycees honored him with a Distinguished Service Award.

In the late 1970s, Ribot married Maria Marrero and moved to Boston. As Executive Director of Roxbury Tenants of Harvard Association, Inc. in Mission Hill (1978–1982), and then as Director of Tenant Relations at Mission Park (1982–83), his work over the next twenty year focused on securing and improving public housing.

Based on his stellar record, in 1984, he became Property Manager and Director of Employment Assistance of the MGA in Roxbury. While the instant charges stemmed from the later years of his tenure at MGA, there is no question that both before these charges, and afterwards, he made a substantial contribution to the project, praised by Boston's leadership, and supported by the tenants themselves. The complex was well maintained and largely crime-free, according to various newspaper accounts. Not content with only improving the physical plant, Ribot developed REAP (Resident Education and Awareness Program), focusing on drug and alcohol treatment as part of social service delivery. The Massachusetts Housing Finance Agency was so impressed with the REAP program, that it adopted it throughout Massachusetts. Even the Massachusetts State Senate recognized Ribot's "Exemplary Service to [His] Community and Housing Development."

### B. *Legacy of abuse*

Ribot's myriad accomplishments were achieved despite the continued legacy of his father's abuse, on two fronts—his alcohol abuse, and his on-going mental illness. By the time of the offense which is the subject of this case, he had apparently conquered the former, but not the latter.

### 1. Alcohol:

The record before the Court suggests that Ribot struggled with alcoholism, drinking to excess throughout his childhood and early adulthood, as if to anesthetize himself.[4] For example, in 1973, even while making substantial contributions to the city of Bridgeport, he was spending time in an intensive treatment program at the Pittsburgh Psychiatric Unit in Pittsburgh, Pennsylvania. Then, in 1977, while still in Bridgeport, Ribot relapsed and was fired from the position he was then holding—Project Director, at Opportunities for Industrialization Centers of America. This time Ribot was truly frightened by the alcoholism. He had passed out while his one and one half year old daughter was playing on the stove. He awoke to his wife's shouts and the smell of smoke. Ribot joined Alcoholics Anonymous and remained sober until 1982. After another relapse, he went to Gosnold Treatment Center in Falmouth, and later obtained treatment through Harvard Vanguard.

---

4. His other siblings likewise suffered. One sister, Marian died at age 45 from overdosing on heroin and other drugs. Three of Ribot's other siblings have battled addiction to drugs or alcohol. Three became compulsive overeaters.

Finally, the treatment worked; Ribot stopped drinking entirely.

## 2. Mental Illness

However, as defense counsel argued, although Ribot "got sober," he did not get "well." For ten years, long predating this offense, Ribot sought psychiatric help. *See* Letter of Dr. Denise Noonan, Harvard Vanguard Medical Associates dated December 20, 1998. In 1993, obviously concerned that his mental stability was deteriorating, he began more intensive treatment with a Dr. Steven Adelman. *See* Affidavit of Dr. Steven Adelman, Harvard Vanguard Medical Associates dated December 21, 1998. Dr. Adelman describes the evolution of his relationship with Ribot as superficial at first, and finally evolving into a relationship of trust. The Harvard Vanguard records review a number of hospitalizations—in November 1994 for seven days in the Waltham Weston Hospital for major depression, on another occasion, also for major depression, at the Miner Street Hospital, and finally, as described below, in November of 1998, for a serious suicide attempt.

Dr. Adelman and Dr. Noonan report that Ribot suffers from a major depressive disorder, with potential life threatening consequences. The depression is accompanied by low self esteem, and a profound fear of returning to the poverty and hopelessness of his beginnings. They suggest that this offense derived from his need to provide security to his family, as well as a manifestation of his profound self loathing and self destruction.

## C. *Achievements Before, During and After the Offense*

In 1992 through 1994, at the height of his achievements at MGA, Ribot committed embezzlement and tax evasion. Significantly, his commitment to the community before, during and afterwards, did not stop: From 1997 until 1998 for example, he worked at the Cambridge Multi Service Center for the Homeless, working as an Emergency Caseworker. Letters from co-workers and employers alike describe him as a man of considerable commitment and compassion, a valuable colleague and employee. *See e.g.,* Letters from Mark Alston–Follansbee, The Program Director of Shelter, Inc.; Cheryl Druckenmiller, The Director of Family Shelter Programs for the YWCA of Cambridge; Glen Ohlund, the Project Director of Project Connect; Michael Sullivan, the Self–Advocacy Coordinator of Bread & James, Inc.; Jack Vondras, Program Director of Cambridge Prevention Coalition.

## D. *November 1998 Suicide Attempt*

On November 22, 1998, Ribot attempted suicide.[5] He ingested life threatening quantities of medication, and was hospitalized for several days. Shortly thereafter, he was transferred to the Arbour Hospital, an inpatient psychiatric facility, for a week.

Dr. Neu, a Colombian psychiatrist, who came to know Mr. Ribot after the suicide attempt, reports making substantial headway with the him, in part, according to Dr. Neu, because he could speak Spanish, and shared with Ribot a common ethnic background. Dr. Neu recommended that Ribot join a long term therapy group to identify the underlying psychiatric issues which precipitated this offense. Dr. Adelman has concurred.

## III. THIS OFFENSE

Between January 1, 1992, and October 21, 1994, the defendant committed the acts which are the subject of this sentencing, acts which seem profoundly inconsistent with his background, the history of his employment, and his life.

Ribot illegally used his position as on-site manager of MGA to embezzle money. The scheme involved inflating legitimate invoices, and then receiving a kickback from the inflated amount; or at times,

---

5. The records reflects that the defendant had been suicidal prior to this attempt.

creating invoices even when no work was performed to support the invoice. In addition, Ribot stole property which had been obtained with MGA funds, and converted them to his personal use. Finally, in order to cover up the scheme, Ribot took steps to prepare false documentation of varying kinds. The cover up included issuing Forms 1099 to contractors, apparently from Ribot's employer, Cornu, in inflated amounts. When one contractor, Chris Tinnin complained, Ribot paid Tinnin's liability by creating more false invoices, or by paying with his own personal check. From another contractor, Troy Whigham, Ribot received blank invoices in order to write up bogus charges. In some cases, Ribot negotiated checks issued to Whigham by forging Whigham's name. Two other contractors, Jesus Vega and Rosa Feliciano, endorsed checks over to Ribot who then deposited them in his personal account. Finally, a number of false invoices were also submitted on behalf of various members of the Colon family, as well as false time sheets for Vernon Edwards, a Resident Superintendent at MGA.

Additionally, Ribot evaded a substantial part of his federal tax liability by failing to report over $115,000 of the funds he received from the embezzlement activities in 1992 to 1994.

## IV. THE GUIDELINES FRAMEWORK

### A. *The Application of the Guidelines*

The Guideline calculation, driven largely by the amount of the loss, leads to a total sentencing range of 24 to 30 months.

*Embezzlement*

1. **Base Offense Level:** Under U.S.S.G. § 2F1.1(a), the base offense level is **6**.

2. **Amount of Loss:** There is a dispute concerning the value of the money embezzled. Probation found $599,893; the parties allege $193,092. If the former, the increase would be 10 (U.S.S.G. § 2F1.1(b)(1)(K)); if the latter the in-crease would be 7 (U.S.S.G. § 2F1.1(b)(H)). I agree with the parties and conclude that the increase is **7**.

3. **More than Minimal Planning:** There is no doubt with respect to an increase for more than minimal planning under U.S.S.G. § 2F1.1(b)(2); this would increase the score by **2**.

4. **Role in the Offense:** There is a dispute with respect to Ribot's role in the offense under U.S.S.G. § 3B1.1(a). Probation recommends a 4 level increase, characterizing Ribot as an "organizer, leader, supervisor or manager of a criminal enterprise involving five or more participants." The parties maintain that Ribot fits into the residual category under U.S.S.G. § 3B1.1(c), which would result in two level increase. I agree with the parties, and increase the score 2 levels.

5. **Abuse of Trust:** There is a dispute concerning whether Ribot abused a position of trust under U.S.S.G. § 3B1.3, and thus should have a 2 point increase. On this issue the government and probation stand on one side, the defendant on the other. I agree with the government, and increase the score 2 levels.

6. **Adjusted Offense Level** for the embezzlement is **19**.

*Tax Evasion*

7. There is no dispute that the tax evasion offenses amount to an **adjusted offense level** of 14.

*Combined and Total*

8. The **Multiple Count Adjustment** under U.S.S.G. § 3D1.4 is **1**, resulting in:

9. **A Combined Adjusted Offense Level** of **20**.

10. **Acceptance of Responsibility:** This adjustment results in a decrease of 3 levels.

11. **Total Offense Level: 17**.

As a result of these calculations, and finding that Ribot is a Category I Criminal

History, the Guideline Range is 24–30 months.

## B. *Amount of Loss*

After an extensive investigation, the government determined that the loss figure was between $120,000 and $200,000 resulting in a seven level enhancement. U.S.S.G. § 2F1.1 (b)(1)(H). This figure was accepted by the defense and included in the plea agreement.

Probation's investigation produced a much more substantial result, namely $599,893, resulting in a ten level enhancement. Probations' figure represents the $499,893 that Cornu's insurance company paid in satisfaction of the $910,856 claim made by the company, plus a $100,000 deductible.

More precisely, the $599,893 figure was derived from the judgment entered in a civil action brought by Royal Insurance Company ("Royal"), as subrogee of Cornu. Ribot did not contest it. At that point, he could not afford a lawyer. Moreover, since he was effectively judgment proof, Ribot lacked any incentive to fight the case.

Ribot did not have the documents underlying the insurance claim until after the first sentencing hearing. Concerned about Ribot's right to challenge the figures, and whether the loss figure offered by Royal was ever tested by the appropriate standards, I ordered the production of the documents in the possession of probation, both to the Court and counsel.

■ The documents produced were essentially a summary of the claims. They did not illuminate the criteria applied to calculate loss, or the basis for the figures.

They did not include a copy of the insurance policy under which the claim was paid, the underlying documents, or interviews which formed the basis for the loss summary. Finally, there was no statement from Royal identifying which portions of the claim were accepted, and which were rejected. Without this information, the defendant cannot test or challenge the accuracy of the determination, and fundamentally, the Court cannot determine what the "loss" figure means. Accordingly, I will not adopt any figure above that which was agreed to by the parties $193,092.

## C. *Role In The Offense: U.S.S.G. § 3B1.1(a)* [6]

The Guidelines increase the sentencing score depending upon the number of participants in the offense, and the defendant's role, vis-a-vis those participants. The more participants the defendant organizes or leads, the higher the score. *See* U.S.S.G. § 3B1.1. A "participant" is defined in the Guidelines Application note as follows: "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n.1). "Criminal responsibility" is a term of art in the criminal law, connoting a certain culpable state of mind.

The government has identified several individuals, Troy Whigham, Christopher Tinnan, Richard Stewart, Vernon Edwards, and members of the Colon family, in addition to the defendant, who were involved in the embezzlement scheme in some fashion. As such, probation concludes that Ribot is an organizer of a more than five-participant activity.

6. U.S.S.G. § 3B1.1 provides:
Based on the defendant's role in the offense, increase the offense level as follows:
(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
(b) If the defendant was a manger or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The government disagrees. It represents that after it had interviewed these individuals, it did not believe that more than three individuals, if that, were knowing participants in Ribot's scheme—that they either understood what Ribot was doing, or that they understood that his conduct violated the law. Thus, there are not five or more "participants" involved, as defined by U.S.S.G. § 3B1.1, comment. (n.1).

The government is in a far better position to evaluate "criminal responsibility" than probation. Accordingly, I accept its characterization. I will add two levels under U.S.S.G. § 3B1.1(c), a residual category (neither organizer or leader of five or more participants (a), nor a manager or supervisor of an organization of that scope (b)).[7]

### D. *Position of Trust*

Probation concludes that a two point enhancement is warranted because Ribot abused his position of trust as on-site manager of the MGA. As the on-site manager, Ribot was responsible for overseeing, coordinating, and approving invoices for services provided by outside contractors, and Cornu employees. He used this position, so the presentence report states, to collect money from false or inflated invoices which he created.

U.S.S.G. § 3B1.3, calls for an enhancement "[i]f the defendant abused a position of public or private trust," not otherwise included in the base offense level or in a specific offense characteristic. The application note to the section pivots a position of trust on the ability to exercise "professional or managerial discretion" which is given "considerable deference," subjecting the holder of the position to less supervision. U.S.S.G. § 3B1.3, comment (n.1).

Ribot claims that his was not a position with "considerable deference" within the meaning of the section. He notes that he could not expend money over $100 without authorization. He could not write checks or approve of any contracts over $200 unless he checked with superiors at the central office. His contracts and expenditures were reviewed and audited by officers at the Central Office. And furthermore, Ribot notes that there were regular audits of the books.

■ The government and probation claim that even if discretion did not inhere in the job, as a practical matter, Ribot had such discretion for two reasons. First, because he was an on-site manager and his "superiors" were some distance away, his judgment would rarely be second-guessed. Second, over his years of service he had earned the trust of his superiors. While a $100 expenditure or $200 contract would have required prior authorization, his word about what was required was sufficient. Under the circumstances, the enhancement is warranted.

## V. DEPARTURE

Defendant offers two grounds for downward departure: mental illness/diminished capacity, and aberrant behavior, both independently, and in combination.

### A. *Mental Illness/Diminished Capacity*

#### 1. Background

The drafters of the Sentencing Reform Act, concerned that sentencing based on different offender characteristics was responsible to a degree for unwarranted disparity in sentencing amongst courts, directed the Commission in 28 U.S.C. § 994(d) to "consider whether the following matters, among others, with respect to a defendant, have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall take them into account only to the extent that they do have relevance." Included in the list of factors for the Com-

---

7. Nor do I find that the scheme was "otherwise extensive" within the meaning of U.S.S.G. § 3B1.1. *See United States v. Tejada–Beltran,* 50 F.3d 105, 113 (1st Cir.1995).

mission to evaluate was a defendant's "mental and emotional condition." *See* 28 U.S.C. § 994(d).

The Commission took that directive and promulgated U.S.S.G. § 5H1.3, a policy statement, not a Guideline, indicating that "mental and emotional conditions are not *ordinarily* relevant in determining whether a sentence should be outside the guideline range." *See* U.S.S.G. § 5H1.3.[8] It was a major step. Mens rea had been an important part of sentencing for, some would say, over a hundred years.[9] At the same time, the Commission's policy was unclear. Nowhere in the Guidelines themselves, or the interpretive material, is there any definition of when mental and emotional conditions *are* relevant—i.e., what is ordinary and what is extraordinary. In effect, the Guidelines recognize how fact bound that decision is, and inappropriate for codification in Guideline form.

The only other reference to mental condition is in U.S.S.G. § 5K2.13, another policy statement, which provides that for defendants who have committed non violent offenses, "while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced men-

tal capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public." Broader than U.S.S.G. § 5H1.3, U.S.S.G. § 5K2.13 explicitly "encourages" a departure for a mental condition that reduces the mental capacity of a non violent offender. *See Koon*, 518 U.S. at 92–96, 116 S.Ct. 2035 (Guidelines categorize factors which might constitute grounds for downward departure as: (1) prohibited;[10] (2) discouraged;[11] (3) encouraged;[12] and (4) not mentioned[13]).

Ribot's mental condition fits within both policy statements. This is not an "ordinary" situation in which the defendant claims depression. Indeed, there is nothing "ordinary" about this case—not the causes of the mental condition, its severity, the defendant's efforts to come to grips with it, or the life threatening results of it. The record suggests perhaps twenty-five years of depression, culminating in an attempt to impose the death penalty on himself. On November 22, 1998, the sentencing had to be postponed because Ribot attempted to commit suicide. His attempt was so serious as to require hospitalization at the Brigham and Women's Hospital for several days. Indeed, his mental and emo-.

**8.** In *Williams v. United States*, 503 U.S. 193, 201, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1993) the court held that policy statements are an authoritative guide to interpreting the Guidelines.

**9.** *See* Jack B. Weinstein, *The Denigration of Mens Rea in Drug Sentencing*, 7 Fed. Sent. R. 121 (1994).

**10.** The Commission lists certain factors which can never be relied on for departure, including the individual's race, sex, national origin, creed, religion, socio-economic status, U.S.S.G. § 5H1.10; lack of guidance as a youth, U.S.S.G. § 5H1.12; drug or alcohol dependence, U.S.S.G. § 5H1.4; and economic hardship U.S.S.G. § 5K2.12. *See* Koon, 518 U.S. at 93, 116 S.Ct. 2035.

**11.** Discouraged factors are those "not ordinarily relevant to the determination of wheth-

er a sentence should be outside the applicable guideline range." U.S.S.G. ch. 5, pt.H, Intro. comment (e.g. family ties and responsibilities, education and vocational skills, military, civil, charitable or public service record). *See Koon*, 518 U.S. at 95, 116 S.Ct. 2035.

**12.** Encouraged factors are those the Commission has not been able to take into account fully in formulating guidelines. *See id.* at 94, 116 S.Ct. 2035(citing U.S.S.G. § 5K2.0).

**13.** If a factor is "unmentioned" in the Guidelines, the court must, after considering the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir.1993), decide whether it is sufficient to take the case out of the Guidelines "heartland." *See id.* at 95.

tional condition was so impaired that Brigham psychiatrists arranged for his transfer to an in patient psychiatric hospital, the Arbour, against his will. He was forcibly removed, apparently kicking and screaming. Ribot appeared before the Court at sentencing as a patient at a psychiatric day hospital, surely not the "ordinary" profile, however that is defined.

■ Ribot's mental illness is also relevant because the letters and affidavits from psychiatrists, which are part of the record before this Court, suggest that this condition contributed to Ribot's offense, that it significantly impaired his judgment and his ability to control his behavior. It resulted in Ribot's doing what he had never done before—embezzle money, and endanger the very job about which he cared deeply.[14]

Ribot's mental condition is not a contrivance, suddenly appearing at the time of this sentencing in order to tug at the Court's heartstrings. It is real and not at all surprising. It has its roots in the extraordinary violence that Ribot suffered at the hands of an alcoholic, violent and dangerous father. For years, Ribot struggled with it, but his efforts seem to have collapsed in 1992–94. By then, he knew he was losing control and reached out to Dr. Adelman for more help.

## 2. Degree of Departure

Given these conclusions, the appropriate sentence is one that enables Ribot to continue his treatment. After his suicide attempt, Ribot was finally released from the hospital on the express condition that he would participate in outpatient care—enter the Minor Street Day Hospital with a Monday to Friday Day psychiatric program.

He did enroll in outpatient care, and according to the records, continues to do so, with apparent success. He entered Dr. Neu's group therapy program, and has begun to address the cause of his problems, and not merely their symptoms. In effect, there is a team of medical professionals whom Ribot trusts—Dr. Neu working in tandem with Dr. Adelman, his existing psychiatrist.

The Bureau of Prisons maintains that it has programs adequate to the task of addressing Ribot's problems. I am skeptical. Any imprisonment necessarily means interrupting any treatment—a period prior to classification (6–12 weeks, perhaps), then classification, and finally, treatment. Imprisonment means interrupting this particular treatment plan, one which seems to offer hope. It means a different therapist, and for Ribot, starting all over.

Furthermore, all psychiatrists describe Ribot as extremely fragile and vulnerable at this time, and warn against the conse-

14. The case law suggests that a diminished capacity departure is not limited to a defendant who is unable to reason, or process information in the usual way. It includes a defendant who is unable to control his conduct, even if his cognitive abilities are unimpaired. *See United States v. McBroom*, 124 F.3d 533, 548 (3rd Cir.1997)(concluded that there is a two prong approach to defining "reduced mental capacity" under U.S.S.G. § 5K2.13—includes a person who is unable to absorb information in the usual way *or* the person who knows what he is doing and that it is wrong, but cannot control his behavior or conform it to the law")(emphasis added); *United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir.1993)("reduced mental capacity" refers not only to a lack of full intellectual functioning, but also emotional conditions as well, including mood disorders); *United States v. Poff*, 926 F.2d 588, 595 (Easterbrook, J., dissenting)("We have treated U.S.S.G. § 5K2.13 as applying to emotion conditions as well [as lack of full intellectual functioning]... Treating emotional illness in the same way that we do mental abnormalities furthers the purpose of U.S.S.G. § 5K2.13. The role of the guideline is lenity toward defendants whose ability to make reasoned decisions is impaired. Emotional conditions, like mental impairments, may distort or suppress the formation of reasoned decisions."); *see also United States v. Santos*, 131 F.3d 16, 20 (1st Cir.1997) (finding that the district court refused to depart because defendant's mental illness did not diminish (1) his capacity to understand what he was doing, nor (2) did it contribute to his carrying out of the offense).

quences of imprisonment.[15] The fact of imprisonment—Ribot's reaction to it— would then stand as yet another obstacle to treatment.

■ Accordingly, although I have found an offense level of 17, I will depart 7 levels to 10—Guideline Range of 6–12 months— to enable Ribot to continue his treatment plan.

## B. An Alternative Ground: Single Acts of Aberrant Behavior

The Sentencing Commission recognized the limitations of a rigid approach to the Guidelines. It acknowledged that there was a "vast range of human conduct potentially relevant to a sentencing decision" U.S.S.G. Ch. 1, Pt. A. intro comment 4(b), and as such, that no single set of Guidelines could accommodate every case. Likewise, the Commission recognized the importance of judicial departures, even in a Guideline system, as the means by which the Guidelines would be refined, and the system would evolve. *Id.* Indeed, the Commission specifically acknowledged one area, "single acts of aberrant behavior," which may still justify probation at higher offense levels through departures." U.S.S.G. Ch. 1, Pt. A, intro comment 4(d).[16]

The First Circuit's definition of aberrant behavior, which it adopted from the Ninth and Tenth Circuits, and which has since been followed by the Second Circuit, seeks to examine the "totality of the circumstances" in deciding whether to grant a departure for aberrant behavior. *See United States v. Grandmaison,* 77 F.3d 555, 563 (1st Cir.1996); *Zecevic v. United States Parole Commission,* 163 F.3d 731, 733 (2nd Cir.1998); *United States v. Jones,* 158 F.3d 492, 500 (10th Cir.1998); *United States v. Pena,* 930 F.2d 1486, 1495 (10th Cir.1991); *United States v. Takai,* 941 F.2d 738, 741 (9th Cir.1991). Factors that may be considered in making this determination include "pecuniary gain to the defendant, charitable activities, prior good deed, and efforts to mitigate the effects of the crime[.]" *Grandmaison,* 77 F.3d at 563. "Spontaneity and thoughtlessness may also be among the factors considered, though they are not prerequisites for departure." *Id.* Such departures are available even though a "course of criminal conduct involves more than one criminal act[.]" *Id.*

In addition, there are two perspectives from which to judge whether particular conduct by an offender is "aberrant". One

---

**15.** Dr Adelman writes: "I am certain that sending him to prison would aggravate his major depressive disorder with potentially life threatening consequences. In my opinion, sending Alfredo to prison would break his spirit in a way that would break him as a human being long beyond the term of his incarceration. His spirit sustains his will to live." In addition, Dr. Adelman predicts heightened vulnerability to abuse while in prison: "His shame, self-loathing, depression and disgust, medically aggravated in his particular case by a prison sentence, would take away his already limited ability to protect himself and make wise choices about self protection in prison."

Indeed, there are two additional bases for the departure in this case, defendant's **extraordinary vulnerability** to abuse in prison, *see Koon,* 518 U.S. at 111, 116 S.Ct. 2035 (finding that the extraordinary notoriety and national media coverage of this case, coupled with the defendants' status as a police officer, makes the defendants susceptible to prison abuse); *United States v. Wilke,* 156 F.3d 749,

753 (7th Cir.1998) (permitting the district court on remand to consider the defendant's sexual orientation and demeanor to determine whether he is extraordinarily vulnerable to abuse in prison, but court must find a sufficient explanation of the reasons given and the nexus of the reasons to vulnerability to abuse in prison)(citing *United States v. Maddox,* 48 F.3d 791, 797–98 (4th Cir.1995); *United States v. Lara,* 905 F.2d 599, 603 (2nd Cir.); and his **extraordinary rehabilitation,** *see* 124 F.3d 533; *see also United States v. Sklar,* 920 F.2d 107, 116 (1st Cir.1990)(holding that a defendant's rehabilitation might, on rare occasions, serve as a basis for a downward departure, but only when and if the rehabilitation is "so extraordinary as to suggest its presence to a degree not adequately taken into consideration by the acceptance of responsibility reduction.")(citing *United States v. Studley,* 907 F.2d 254, 259 (1st Cir.1990).

**16.** *See* n. 2, *supra.*

compares the offense and offender with other offenders who have committed the same offense. This approach is a different formulation of the "heartland" concept. *See e.g., United States v. Delvalle,* 967 F.Supp. 781, 784 (E.D.N.Y.1997). Alternatively, one can compare the offense, and the conduct it entailed, with the rest of the offender's life. This approach focuses entirely on the offender's life—his or her character, record in the community, and all the factors considered by the *Grandmaison* court in the "totality of circumstances." *See* 77 F.3d at 563. The latter is the appropriate approach in this case.

Plainly, first-offender status, standing alone, is insufficient to justify a departure. It may be considered as part of the mix, but is not dispositive. *Id.* at 564. Ribot is more than "just" a first offender. He has had no encounters with the criminal justice system before this one. There are no arrests, no juvenile record—nothing. He has been more than "just" law abiding.[17] He has made real and important contributions to the communities in which he has lived—the Hispanic community in Bridgeport, tenants in public housing in Boston, individuals with whom he interacted in the Peace Corps, in the civil rights community. The letters, the awards, and newspaper accounts about Ribot are singularly impressive and even in a Guideline regime, must count for something. One describes him as a "committed human being"; others speak of his decency, his deep remorse and contrition, his human rights advocacy; that he is a "dedicated human being," and "deeply compassionate," that he regularly went "above and beyond expectations," that he radiated an exceptional level of sincere kindness. And I cannot ignore

those of who have come forward, even knowing that Ribot stands convicted of serious offenses: the Former Mayor of Bridgeport, a member of Cornu Management, one of his employees, a judge of the superior court in Connecticut. Captain Robert C. Robinson of the Bridgeport police not only wrote to the Court; he attended each session of the sentencing hearing to express his continuing support for Ribot.[18]

### C. *Factors in Combination*

The best approach to evaluating Ribot's case is to look at all of the factors described above in combination. The aberrant conduct approach directs the Court to evaluate this offense against a backdrop of the rest of the defendant's life. But the mental health data provides an explanation for why, in the midst of an otherwise exemplary life, Ribot would do something so self destructive and ill advised.

### IV. CONCLUSION

Accordingly, I sentenced Ribot to thirty-six months of probation, six months of which is in home detention with electronic monitoring. In addition, as an express condition of probation, Ribot is ordered to participate in both a substance abuse and a mental health program, as selected by the United States probation office. Ribot is also ordered to pay $193,092 in restitution directly to his former employer, Cornu.

**SO ORDERED**

---

17. This is not to suggest that being "law abiding" alone would not be sufficient in a given case. The inquiry is fact intensive; that factor would have to be placed in the context of other factors in the *Grandmaison* analysis.

18. The government suggests that Ribot's allocution at the first sentencing hearing showed no remorse. The government strongly overstates the case. Ribot plainly expressed his

remorse, indeed, his disgust at his actions. When he suggested that he had not benefitted from his offenses, in context, I interpreted that to mean that the benefits which he had received for most of his life had come from his own legitimate hard work, that he hoped his life's record would not be reduced to, and tainted by, these acts.