**UNITED STATES of America**

v.

**Troy FOOTMAN, Defendant.**

**No. CRIM. 98–CR–10067–NG.**

United States District Court,
D. Massachusetts.

June 1, 1999.

See also, 33 F.Supp.2d 60.

Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Troy Footman, aka Troy Clarks aka Troy Clark, Defendant.

Charles P. McGinty, Federal Defender Office, Boston, MA, for Kimyou Tes, aka Rina Kong, Defendant.

Paula J. DeGiacomo, United States Attorney's Office, Boston, MA, for U.S.

### SECOND AMENDED SENTENCING MEMORANDUM [1]

GERTNER, District Judge.

TABLE OF CONTENTS
SECOND AMENDED SENTENCING MEMORANDUM
June 1, 1999

I. BACKGROUND ........................... 88
 A. A.M. ................................. 88
 B. S.O. ................................. 89
 C. J-3 .................................. 90
 D. Rita Boykins ......................... 90

---

1. The Government moved to substitute "J–3," "A.M.," and "S.O." in place of the names of three victims who were juveniles during all or part of the relevant time period. The Memorandum has been amended accordingly.

II. WHICH GUIDELINE BOOK SHOULD APPLY? ................................. 90
 A. The Guidelines Pre–November 1, 1996 ...... 90
 B. The November 1, 1996 Amendments ........ 91
 C. Ex Post Facto Issue.... .. ............... 91
III. GUIDELINE CALCULATIONS .......... ... 92
 A. Grouping Rules .......................... 92
 B. Specific Groups ....................... .. 92
 (1) Group 1: ........................... 92
 (2) Group 2: ............... ............ 97
 (3) Group 3: ..................... ...... 98
 (4) Group 4: ....................... ..98
 (5) Group 5: ...................... ......98
IV. MOTION FOR UPWARD DEPARTURE .. ... 98
 A. Criminal History ....................... 99
 1. Framework .................... .... 99
 2. Footman's Criminal History ........ 101
 (a) Unscored Convictions ......... 101
 (b) Convictions within the Rele-
 vant Time Period ........ ..... 102
 3. Additional Information ........ ..... 102
 (a) The Defendant's Words: ....... 102
 (b) The Trial Testimony ........... 103
 4. Degree of Departure............ ... 103
 B. Abduction ............................. 104
 (1) S.O. ........ ..................... 104
 (2) A.M. ............................... 104
V. CONCLUSION ... ...................... 105

On November 18, 1998, the defendant, Troy Footman (hereinafter "Footman") was found guilty of conspiracy to transport women, including three minors, from Lowell, Massachusetts, to New Castle, Delaware, for prostitution and sexual activity, in violation of 18 U.S.C. §§ 2421 and 2423(a). He was also found guilty of a succession of substantive offenses, each count representing a particular trip with a particular minor (A.M., age 17, S.O., age 17, and J–3, age 14), or woman (Rita Boykins [hereinafter "Boykins"]). Finally, Footman was convicted of using an interstate facility, Western Union, to distribute the proceeds of a prostitution enterprise in violation of 18 U.S.C. § 1952(a)(1).[2]

18 U.S.C. §§ 2421 and 2423(a) criminalize the transportation of women and girls across state lines for the purpose of prostitution and other sexual activity. To convict, the government does not have to prove that the women were coerced to participate in these activities. It is enough if the defendant "knowingly transports" them for the purpose of prostitution.[3] From one perspective, therefore, §§ 2421 and 2423(a) can simply be viewed as federal versions of standard state statutes prohibiting pimp and prostitution activity. In Massachusetts, for example, the maximum sentence for such acts would be five years; while in federal court, it is ten.[4]

But the facts of this offense go well beyond the barebones statutory outline. What was involved here was much more than "just" an immoral business activity, namely commercial sex conducted across state lines. At least one very young girl— only fourteen years old—was enlisted, while two others were only seventeen. These girls worked as prostitutes at a Delaware truck stop, far away from home. They spent their nights going from truck to truck, driver to driver, engaging in sexual acts in truck cabs or trailers, or occasionally, in a motel room, not because Footman was so charming, or the economic incentives so enticing, but because Footman controlled them. Their compliance was enforced by rape, abduction and beatings. Plainly, these were not just economic crimes, or crimes of immoral conduct. Make no mistake about it, they were crimes of violence. Their analog are the state crimes of rape and kidnaping which

---

**2.** Footman was acquitted of Count Two of the indictment which involved allegations of an additional transportation of A.M. to Delaware, and Count Twenty and Count Twenty–One, both involving the use of an interstate facility with intent to distribute.

**3.** Prior to 1986, a defendant could be charged under § 2423 if he "knowingly persuade[d], induce[d], entice[d], or coerce[d] any woman or girl who has not attained her eighteenth birthday" to travel in interstate commerce "to engage in prostitution, debauchery or other immoral practice." In addition to extending the statute to minor boys and modernizing the statute in other ways, Congress, in 1986, re-placed the persuasion, inducement, enticement, and coercion language, with "transport" of a minor in interstate commerce. *See* Pub.L. 99–628; H.R.Rep. No. 910, 99th Cong., 2nd Sess.1986, 1986 U.S.C.C.A.N. 5952. This statute also amended similar language in § 2421 in regards to transporting adult women. *See id.*

**4.** *See* Mass. Gen. L. ch. 272 §§ 4A (inducing minors into prostitution); 4B (living off or sharing earnings of minor prostitution); 7 (support from or sharing, earnings of prostitute).

provide maximum sentences of ten to twenty years, or possibly life, if a child under 16 years is involved.[5]

On March 25, 1999, following a fifteen day trial, two sentencing hearings, and elaborate legal and factual submissions, I sentenced Footman to 180 months: 120 months on counts 3–6 concurrent with each other; 60 months on count 1, consecutive with the sentence on counts 3–6, and 30 months on counts 7, 8–19 to be concurrent with the sentence imposed on count 1.

This case raises a number of issues: 1) Which Sentencing Guideline book applies? In November of 1996, there were substantial changes to the Guidelines applicable to Footman, changes which would have resulted in a three level increase in the Guideline score, and a substantial increase to his sentence; 2) How should the Court resolve certain questions which affect enhancements to the Guideline score: (a) Did Footman have a managerial or supervisory role in an extensive organization? (b) Were there "vulnerable victims"? (c) Was there an obstruction of justice? (d) Was force or coercion involved? Finally, 3) Should the Court depart from the Guidelines score which results, once questions 1 and 2 are answered, on the basis of his criminal history and the fact that the offense included a brutal rape and abduction?

## I. BACKGROUND

The offenses involved here took place between June of 1996, and January of 1997. After spending almost a year in jail awaiting trial on a Suffolk Superior Court indictment for inducing a minor, A.M., to engage in sex, and deriving support from her prostitution activities, Footman decided that it was "too hot" for him to continue his prostitution operations in Boston, Massachusetts. In an effort to avoid further police attention, he moved the operation to a Delaware truck stop. In so doing, Footman took with him, or arranged for the transportation of, Boykins, another woman Kim You Tes (hereinafter "Tes"), and the three minors, A.M., J–3, and S.O.[6]

While in Delaware, Footman told his "girls" where to stay, and what to charge. At the end of the day, he took the money they earned. The highlights of the testimony follow: [7]

### A. A.M.

A.M. was 16 years old in 1994 when she began working as a prostitute for Footman. In December of that same year she became pregnant by him.[8]

In late July and early August, 1996, Footman directed A.M. to engage in prostitution with truck drivers at a Delaware truck stop. As part of their arrangement, A.M. was to give Footman all of her earnings, except for a small amount to pay for personal hygiene items. Additionally, as the "bottom girl"—a term suggesting that she had worked with Footman the longest—she was also responsible for collecting money from the other "girls," and wiring it to Footman in Boston.

After she returned from this trip to Delaware, A.M. made the first of a number

---

5. See Mass. Gen. L. ch. 265 §§ 22 (rape); 22A (rape and force of a child under 16 years); 26 (kidnaping).

6. Tes was also alleged to be part of the conspiracy. Initially, she was indicted on the same charges as Footman. The charges were subsequently dismissed by the government. Although other women were also mentioned in court testimony, it is not always clear precisely for whom they worked and when.

7. These highlights derive from the trial testimony of the women and Delaware police conducting surveillance, the documentary record

of motel registrations and wire transfers, tape recorded CB transmissions at the truck stop (conducted by Delaware state police), and consensual recordings from MCI Concord between Footman and various individuals.

8. It was her accusations that put Footman in jail for over a year, awaiting trial on charges of deriving support from the prostitution of a minor and witness intimidation. See section IV Motion for Upward Departure, (A)(3)(b). This matter was developed by the defense during cross-examination.

of efforts to leave Footman. She decided that she would rather work for an escort service in Boston than continue to prostitute herself in Delaware. Fearing that this decision would anger Footman, she applied for, and received, a restraining order on September 3, 1996.

On September 6, 1996, when A.M. returned home, Footman was waiting for her on the porch. When she saw him, she ran into the house. He followed her and pushed her up against a wall. She screamed in vain, "Help! Troy's here. He's going to kill me." Footman pulled her out of her house, dragged her into the backyard, and threw her over the fence. At that point, Footman, and two other men, shoved A.M. into a car, and drove her to a bar. There, Footman took all of A.M.'s earnings from her escort work, ostensibly to pay the men who had helped him abduct her, leaving her with nothing.

Later that evening, A.M. bargained with Footman to allow her to have her own place and a boyfriend, if she paid him the money she made prostituting herself. He agreed, but by the next morning, reneged. Instead, their former arrangement would stand: She would work for him and give him all the money she made, while he would give her living expenses.[9]

Before A.M.'s 18th birthday on October 23, 1996, Footman again ordered his "women" to Delaware, providing them with driving directions. On this trip, A.M. drove J-3, and others, while Footman drove S.O.[10] During this, and a subsequent trip before Christmas, A.M. and Boykins wired money to Footman, money which they, and the other girls, had earned as prostitutes.

By mid January of 1997, A.M. tried again to leave Footman by hitching a ride with a truck driver. In February, 1997, she returned, this time working for a different pimp. Footman found her again, and beat her mercilessly. He dragged her from her motel, threw her in his car, and took her to his room. There he yelled, punched her in the face, and kicked her for over 45 minutes. To stop the pain, A.M. agreed to return to work for him; she also believed that she was pregnant at the time. But the beating did not stop. By the time she got back to her motel, she was covered with blood and battered. S.O. confirmed seeing A.M. severely beaten.

After this beating, A.M. again hitched a ride out of Delaware. By April of 1997, however, she was back. When asked why she returned, she testified "I had no place else to go."

### B. *S.O.*

S.O. met Footman in September of 1996 when she was 17 years old. At the time, she was appearing in court to address issues related to a criminal charge and custody questions concerning her child. During his first solicitation of her, Footman told S.O. that it took money to get her child back, money she could make working for him in an escort and body massage service. S.O. had no place permanent to live at this time. Footman found her the second time at the home of her friend's foster parents, where she was staying temporarily.

After this second solicitation, S.O. began working for Footman as a prostitute in Chinatown; it was the first time she had taken money for sex. Like A.M., she gave Footman all her money, keeping only a small amount for her own expenses. Eventually, as he did with A.M., Footman told S.O. that they would need to move their "work" to the Delaware truck stop,

---

9. On September 9, 1996, a complaint was issued from the Lynn District Court charging Footman with Assault and Battery and violation of the restraining order. Footman was arrested on February 12, 1997. A.M. appeared in the Lynn District Court but denied that Footman was involved in the abduction. On the stand in the trial before me, A.M. admitted she lied in court to protect Footman.

10. Boykins made her way to the Delaware truck stop on that occasion by herself, with Footman's directions.

since the police were "on to" him. He also warned her that it was dangerous to work in Boston because she was a juvenile.

As a result, S.O. accompanied Footman for her first trip to Delaware in the October, 1996 trip described above.

But, by late November, 1996, S.O., like A.M., attempted to leave Footman to work for another pimp at the truck stop. Footman made sure she did not succeed. He abducted S.O., put her in the car, and drove her to a motel. S.O. tried to escape, but Footman chased her. When he finally got her back to his motel room, he beat her with "anything in sight," and then raped her both vaginally and anally. After the rape, S.O. escaped and hitched a ride with one of the truck drivers back to the truck stop. Motel records place Footman at a Quality Inn near the truck stop on November 23, 1996. Fifteen days after the rape, S.O. managed to get to a hospital.

### C. *J-3*

J-3 was only 14 years old, and had recently run away from home when she first accompanied A.M. to the Delaware truck stop, at Footman's direction. Since J-3 was new at "the business," Footman instructed A.M. to have J-3 watch her the first night, and to "show" J-3 the ropes. Since J-3 was so young, he told A.M., "he could get her the way he wanted her."

11. § 2G1.2 provided:
 (a) Base Offense Level: 16
 (b) Specific Offense Characteristics
 (1) If the offense involved the use of physical force, or coercion by threats or drugs or in any manner, increase by 4 levels.
 \* \* \* \* \* \*
 (3) If the offense involved the transportation of a minor at least twelve years of age but under the age of sixteen years, increased by 2 levels.

12. § 2G1.1 provided (before amendments):
 (a) Base Offense Level: 14
 (b) Specific Offense Characteristic

Thus, J-3 began to work for Footman, giving the money she made to A.M. who wired it back to him.

### D. *Rita Boykins*

Rita Boykins knew Footman since she was 16, and had worked for him as prostitute in the Chinatown section of Boston, Massachusetts. She was also the mother of two of his children. She confirmed trips to the Delaware truck stop in October of 1996, along with A.M., Tes and J-3, and that money obtained from prostitution activities in Delaware was wired to Footman.

## II. WHICH GUIDELINE BOOK SHOULD APPLY?

The Government contends that the applicable Guidelines are those that were amended effective November 1, 1996. The defendant argues instead that the appropriate Guidelines are those in effect before that date. The difference is considerable. In essence, the November 1, 1996 Guidelines would ratchet up the score associated with the counts for transporting a minor, the most serious charge facing Footman, three levels.

### A. *The Guidelines Pre-November 1, 1996*

Prior to the November 1, 1996, amendments, two guidelines covered the conduct in this case. U.S.S.G. § 2G1.2 addressed the transportation of minors for the purpose of prostitution,[11] and U.S.S.G. § 2G1.1 addressed the transportation of the adults.[12] As applied to the youngest

 (1) If the offense involved the use of physical force, or coercion by threats or drugs or in any manner, increase by 4 levels.

 (c) Special Instruction
 (1) If the offense involved the transportation of more than one person, Chapter Three, Part D (Multiple Counts) shall be applied as if the transportation of each person had been contained in a separate count of conviction.

victim in this case, J–3, U.S.S.G. § 2G1.2 would involve a base offense level of 16, coupled with an enhancement of two levels (§ 2G1.2(b)(2)) for the age of the victim, for a total level 18, before any additional applicable enhancements. As applied to the others, who were seventeen at the time of the transportation (S.O. and A.M.), the base offense level before other adjustments was 16. U.S.S.G. § 2G1.2(b)(3).

### B. *The November 1, 1996 Amendments*

The Sex Crimes Against Children Prevention Act of 1995 (SCAPA), 109 Stat. 774 (1995), directed the Sentencing Commission to amend the Sentencing Guidelines to "increase the base offense level for an offense under section 2423(a) of title 18, United States Code, by at least 3 levels." The Commission did so, effective November 1, 1996. Furthermore, by amendment, the Commission combined the two sections, U.S.S.G. §§ 2G1.2 and 2G1.1, into a single one, U.S.S.G. § 2G1.1.[13]

The amended U.S.S.G. § 2G1.1 begins with a base offense level of 14. If the offense involved a minor, the sentence is increased 5, 7, or 9 levels depending on the age of the child. For a fourteen year old, like J–3, the level would be 21; for seventeen year old, the level would be 19—each score equal to three more levels than under the pre-amendment scheme.

### C. *Ex Post Facto Issue*

■ The Ex Post Facto clause of the Fifth Amendment forbids the imposition of punishment more severe than that assigned by law when the punishable act occurred. *Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987);

*United States v. Harotunian,* 920 F.2d 1040, 1042 (1st Cir.1990). Ex Post Facto problems arise where—as here—the government argues for the application of an amendment that would potentially increase a defendant's sentence for crimes which occurred before its effective date. *See United States v. Shorter,* 54 F.3d 1248, 1261–62 (7th Cir.1995).

■ Determinations concerning retroactivity become even more complicated when the "one book rule" is thrown into the mix. According to this rule, adopted by the Commission in 1992, a sentencing court is required to apply a Guideline manual in its entirety; in essence prohibiting a defendant from selecting piecemeal from different versions of the manual to come up with the most advantageous combination of provisions in computing his sentence. *See* U.S.S.G. § 1B1.11.

The government argues that the more onerous November 1, 1996, amendments apply, because at least one of the minor transportation counts, Count 6 (with J–3), occurred after the new guideline became effective. Citing to *United States v. Regan,* 989 F.2d 44, 48 (1st Cir.1993), the government maintains that there is no constitutional violation since the defendant presumably had "fair notice" that the Guidelines had changed. Furthermore, the government argues that the "one book rule" would call for the application of the amended Guidelines to all of Footman's convictions.

■ I find *Regan* does not apply at all. I cannot conclude with confidence, based on the record I have heard, that the transportation of J–3 necessarily took place after November 1, 1996, as opposed

---

**13.** § 2G1.1 Promoting Prostitution or Prohibited Sexual Conduct

(a) Base Offense Level: 14

(b) Specific Offense Characteristics:
(1) If the offense involved the use of physical force, or coercion by threats or drugs or in any manner, increase by 4 levels.

(2) If the offense involved a victim who had (A) not attained the age of twelve years, increase by 9 levels; (B) attained the age of twelve years but not attained the age of sixteen years, increase by 7 levels; or (C) attained the age of sixteen years but not attained the age of eighteen years, increase by 5 levels.

\* \* \* \* \* \*

to before.[14] The testimony on the issue is fundamentally confused; indeed there is more evidence pointing to the pre November 1, 1996, period than post November 1, 1996. For example, according to A.M.'s testimony, J–3 was a passenger in a car driven to Delaware before A.M.'s 18th birthday on October 23, 1996. Furthermore, A.M. testified that, prior to the car trip, J–3 actually made her first trip to Delaware in a bus with A.M. While J–3 claims that she took the bus to Delaware on November, 17, 1996, this is not sufficient evidence, in light of the conflicting testimony, to establish a concrete post November 1, 1996 event. The government concedes as much. The indictment charges that the J–3 trip was "between in or about October 1996 and November 1996." The government's failure of proof precludes me from finding that the applicable guidelines are the later, more onerous ones.[15]

## III. *GUIDELINE CALCULATIONS*

### A. *Grouping Rules*

In the Presentence Report, the conspiracy count was grouped with each count alleging interstate transportation of a woman or girl for prostitution, and in some cases, the use of an interstate facility to distribute the proceeds of a business enterprise involving prostitution during a particular time frame. More precisely:

■ The Conspiracy Count—count one—is grouped with the substantive counts per U.S.S.G. § 3D1.1;

14. This analysis, which addresses when key events occurred, focuses on the transportation of minor counts, the only provisions changed by the 1996 amendments.

15. Indeed, the rule of lenity obligates me to apply the guideline that will produce the more lenient result. *See e.g., United States v. Granderson*, 511 U.S. 39, 53–57, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994); *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage); *United States v. Kozminski*, 487 U.S. 931, 952, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) (the

■ Transportation for prostitution and of a minor 18 U.S.C. §§ 2421 and 18 U.S.C. 2423(a)—counts three through seven—are grouped with the conspiracy count, but are not grouped together per U.S.S.G. § 3D1.2; and

■ Use of an interstate facility—counts eight through nineteen—are grouped with the conspiracy count and each substantive count during the general time period, per U.S.S.G. § 3D1.2(c).[16]

### B. *Specific Groups*

(1) **Group 1: Count 1—Conspiracy, Count 3—Interstate Transportation of a Minor (A.M. Trip July–August 1996); Count 8—Use of Interstate Facility with Intent to Distribute Proceeds of a Business Enterprise Involving Prostitution.**

Base Offense—U.S.S.G. § 2G1.2(a) **16**

Role in the Offense—U.S.S.G. § 3B1.1(a) **No adjustment**

The government seeks a four level increase on the ground that the defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive". *See* U.S.S.G. § 3B1.1(a). Conversely, the defendant claims that the other individuals involved in this offense were not "participants," within the meaning of Application Note No. 2, and should not be counted towards the requisite "five." I agree.

purpose of the rule of lenity is to promote fair notice to those subject to the criminal law, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors, and courts).

16. The government believes that the interstate facilities counts should not be grouped with the transportation and conspiracy, but rather have each such count constitute a separate group. The government recognizes, however, that its approach would not affect the outcome here and so I will not address it.

■ As I noted in *United States v. Ribot*, 1999 WL 165919 (D.Mass.), the definition of "participant" in the Guidelines Application note is keyed to the definition of criminal responsibility. *See id.* at *6. A participant is defined in the Guidelines Application note as someone who is "criminally responsible for the commission of the offense, but need not have been convicted" U.S.S.G. § 3B1.1, comment (n.1). " 'Criminal responsibility' is a term of art in the criminal law, connoting a certain culpable state of mind." *Ribot*, 1999 WL 165919 at * 6. In *Ribot*, I concluded that the other identified individuals involved in the crime did not share the defendant's culpable state of mind, so they could not be counted as "participants" for purposes of this increase. *See id.*

■ In the instant case, none of the women, with the exception of Tes, was included in the indictment. Plainly, the indictment and the proof offered by the government, characterized the women and girls instead as victims, not participants. Everything I heard confirms this fact.

Furthermore, although Tes was originally included in the indictment with Footmen, charges against her were subsequently dismissed. Nothing I heard in the trial, or read in the parties' submissions persuades me that Tes was in a different category than the other women or girls. Thus, I find that there were no "participants" involved with Footman in these crimes, as required for this increase. *See* U.S.S.G. § 3B1.1(a); *Ribot*, 1999 WL 165919 at *6.

As an alternative, the government claims that the organization was "otherwise extensive" within the meaning of the Guidelines.[17] *See* U.S.S.G. § 3B1.1(a). The Guidelines hardly define "otherwise extensive" except to suggest that in calculating this enhancement, I am to consider, more broadly, "all persons involved during the course of the entire offense." Application Note 3, § 3B1.1.

Since the concept "otherwise extensive" is ambiguous, and, apparently involves more than just counting people, it behooves me to put it in context. All that the Guidelines report on this score is a background note suggesting that an individual in a leadership position in a larger organization will make higher profits, pose a greater danger to the public, and a greater danger of recidivism. *See* Background Note to § 3B1.1.

■ In my judgment, after hearing the trial testimony, and reviewing the government's most recent submissions, the Footman operation does not qualify. It was little more than the Chinatown pimping operation transported to a Delaware truck stop. That move increased the complexity of the task at hand to a degree, but not enough to transform it into some kind of "organization," "otherwise extensive" or not. To be sure, there were bus tickets to be purchased, motel rooms to be rented, and money to be wired. Indeed, the government suggests, given the number of trips there were many bus tickets, rooms, and as much as $8,000 wired. Footman even used an alias, Troy Clark, and three different locations in Lowell for the pickup of the money. But the activity did not change materially, nor his role in it. Instead of pimping in Chinatown or Lowell or wherever, he now focused on a Delaware truck stop.

In its latest submissions, the government suggests that as many as eleven women were involved with Footman at the Delaware truck stop. Several names were mentioned during the course of the trial; several had papers or other personal effects in Footman's home; several were referred to in Footman's conversations while he was in jail, awaiting trial. Nevertheless, the record is enormously confusing on this score—perhaps because the situa-

17. This is an argument that the government made in its initial submissions and reiterated in greater detail in pleadings filed after this Court's initial sentencing memorandum.

tion was fundamentally disorganized. I could not say who was involved when; women who were involved one month, were absent the next, sometimes connected with Footman, sometimes with other pimps.

And Footman, while he was brutal and controlling when the woman strayed (as with A.M. and S.O.) did not necessarily direct their day to day activities. Sometimes motel or transportation arrangements were made by the women; it was not particularly difficult to figure out.

Finally, Footman's "role" was not dramatically different than that of the typical defendant engaging in the kinds of activities covered by U.S.S.G. §§ 2G1.1 and 2. It was surely not sufficient to qualify as an "aggravating" factor, above and beyond the Guideline offense level.

The First Circuit's position in *United States v. Anderson*, 139 F.3d 291 (1st Cir. 1998) does not suggest otherwise. In *Anderson*, the Court held that the word "extensive," within the meaning of U.S.S.G. § 3B1.1, derives from "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." 139 F.3d at 298 (citing *United States v. Rostoff*, 53 F.3d 398, 414 (1st Cir.1995) (quoting *United States v. Dietz*, 950 F.2d 50, 53 (1st Cir. 1991))). The First Circuit affirmed the trial court's fact findings, after a lengthy trial. While the facts are not recounted in great detail in the decision, it appears that the trial court concluded that the "organization" was otherwise extensive because it involved prostitution in three states, and transportation activities that were fairly elaborate. *See* 139 F.3d at 296. In addi-

tion, the trial judge credited the testimony of one witness that eight individuals were involved. *See id.*[18]

Footman's activities revolved around a single place—the Delaware truck stop. I cannot determine, as did the trial court in *Anderson*, how many more women were involved than the ones specifically named in the indictment. The phrase "otherwise extensive" and indeed, even the word "organization," seem entirely misplaced when applied in this instance.

Vulnerable Victim—U.S.S.G. § 3A1.1(b)
**No adjustment**

■ The government also argues for an increase under U.S.S.G. § 3A1.1, which permits an upward adjustment for criminal conduct directed at unusually vulnerable victims. The theory is that conduct against this particular group of victims is more blameworthy than the conduct of other offenders and thus, deserves greater punishment. *See* John Garry, *Why Me? Application and Misapplication of § 3A1.1, The "Vulnerable Victim" Enhancement of the Federal Sentencing Guidelines*, 79 CORNELL L.REV. 143, 144 (1993). U.S.S.G. § 3A1.1, in effect, "codifies judicial discretion to impose harsher sentences on defendants who commit similar crimes, but whose choice of victim identifies them as deserving greater punishment." *Id.* at 147.[19]

■ The touchstone is "unusual." The provision notes that the defendant "knew or should have known that the victim... was *unusually* vulnerable..." (Italics supplied). "Unusual" is plainly meant to identify a select group different than the con-

---

**18.** *See also United States v. Sabatino*, 943 F.2d 94, 101–02 (1st Cir.1991) (holding that the pervasive nature of the enterprise—including between 15–30 employees in one location alone, servicing clients in three states, would bring it within the "otherwise extensive" language of U.S.S.G. § 3B1.1(a)).

**19.** § 3A1.1(b) provides:

If the defendant knew or should have known that a victim of the offense was *unusually vulnerable* due to age, physical or mental condition, or that a victim was otherwise *particularly susceptible* to the criminal conduct, increase by 2 levels.

(Italics supplied). Both phrases, "unusually vulnerable" and "particularly susceptible" connote something out of the ordinary.

stituency who will be the "usual" victims of the specific offense.[20]

■■■■ The court is not to apply this increase if the offense guidelines already specifically incorporate the particular factor of vulnerability into the baseline calculation. *See Koon v. United States*, 518 U.S. 81, 94, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). In the case of U.S.S.G. § 2G1.2, the age of the victim is included in the offense guideline, as is reflected in the incremental increases provided based on the age of the minor who is transported.[21] Therefore, the ages of A.M., S.O. and J–3 alone, cannot result in an increase under this provision.

■■■■ Likewise, if the factor which makes the victim vulnerable is not at all "unusual" for the typical victims of the offense, the increase is not permitted. In *United States v. Sabatino*, 943 F.2d at 103, for example, the First Circuit observed that a § 3A1.1(b) enhancement would be appropriate only where "the young women employed as prostitutes by the [defendant]

were 'unusually vulnerable,' that is 'unusually vulnerable' given the kind of victim that is typically involved in a Mann Act violation and that Congress aimed to protect." *Id.* at 103.[22] The sentencing court's task, therefore, is to evaluate the evidence to determine what, if anything, was special about the girls that would distinguish them from the typical individuals who would fall prey to a Mann Act violator. *See id.*

In *Sabatino*, the court held that a review of the legislative history of the Mann Act suggested that the "vulnerable" factors provided by the government—that the women are otherwise out of work, or that they have small children—were typical of the victims the Act was to protect, rather than "unusual." *See id.*

Because age is already included in the offense category, in order to qualify for this enhancement, the government would have to show that the victims in this case were vulnerable in ways beyond their age, i.e., not just the usual vulnerabilities of minors, but special vulnerability of the specific minors involved in this case.

20. Thus, the U.S.S.G. § 3A1.1 Application Note 2 indicates that a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank. *See also* Garry, *supra* at 163.

21. In *United States v. Plaza–Garcia*, 914 F.2d 345, 347 (1st Cir.1990), the First Circuit reversed a district court's U.S.S.G. § 3A1.1 enhancement of a sentence under U.S.S.G. § 2G2.1 (sexual exploitation of a minor). The court held that the victim's age was specifically incorporated into the offense guideline, meaning that the Sentencing Commission had already taken the factor into account when calculating the base offense level. *See id.* Thus, § 3A1.1 was inapplicable by its own terms.

22. For example, in *United States v. Moree*, 897 F.2d 1329, 1335 (5th Cir.1990), the court reversed the district court's enhancement of a sentence for conspiring and endeavoring to obstruct justice. The defendant had offered to "fix" the case of a Mississippi highway commissioner indicted on eleven counts of extortion, bribery and tax evasion. *See id.* at 1331. The court below found that the commissioner was a vulnerable victim because his indictment rendered him particularly suscep-

tible to the defendant's criminal conduct. *See id.* at 1335–36. In reversing the district court's application, the Fifth Circuit held that the "vulnerability that triggers § 3A1.1 must be an 'unusual' vulnerability which is present in only some victims of that type of crime. *See id.* Otherwise defendants' choice of a likely victim does not show the extra measure of criminal depravity which § 3A1.1 intends to more severely punish." *Id.* at 1335.

To be sure, *Moree* was an extreme situation, using the fact of the indictment to buttress a finding of vulnerable victim where it was the indictment that made possible the offense itself—offering to fix the deposition. The court held that "a condition that occurs as a necessary prerequisite to the commission of a crime cannot constitute an enhancing factor under § 3A1.1," *Id.* The court distinguished conditions of susceptibility that give rise to a "vulnerability [that] made the attempted crime possible" from those which could properly serve as a foundation for a sentencing court's identification of "an unusually vulnerable victim." *Id.* at 1336. The *Moree* court held that the highway commissioner's indictment was properly categorized as the kind of susceptibility that made the crime possible. *See id.*

Moreover, apart from age, the government would have to show that these victims were vulnerable in ways that were "unusual" for victims of this kind of offense. As in *Sabatino*, the government cannot meet this burden. *See* 943 F.2d at 103.

The vulnerabilities the government identifies are those related only to the age of these victims, not special or different from that of the typical victim of this offense.[23] Arguably, runaway status, homelessness, and economic exigency are not *always* associated with victims of the offense, but there is no question that they are *typically* associated with this offense. *See Sabatino*, 943 F.2d at 103.

Obstruction of Justice—U.S.S.G. § 3C1.1 add 2

 The government seeks an upward adjustment under U.S.S.G. § 3C1.1 for obstruction of justice.[24] The core of the government's case involves tape recordings of conversations between Footman and others while Footman was incarcerated at M.C.I. Concord. I have listened to the tapes in their entirety. I have reread the transcripts. As a result, I have no doubt that Footman was threatening and intimidating potential witnesses in this case, and that he was attempting to suborn perjury. The overheard conversations reflect his attempts to enlist the aid of, then codefendant Tes, Boykins, and others, to find and contact witnesses in order to prevent them from testifying or to influence their testimony.

The defense maintains that the conversations related to state grand jury proceedings and not to the federal charges at issue. If there is ambiguity on this score, then he suggests that the enhancement should not apply.

Clearly, the tapes reflect a concern about the federal charges, and an effort to orchestrate the response to them. In a conversation on November 26, 1997, Footman interrogates Tes about "Pebbles," one of the juveniles in the case. Tes tells Footman what "Pebbles" had said, that they just rented a car from Footman and nothing more. Footman then berates Tes for giving information to the police, which, in context, clearly refers to the Delaware activities. He directs Tes to tell everyone to keep their mouths shut.

While the defense suggests that this is innocent, lawyerlike advice, in fact Footman does more. When the exhortation to silence is not enough, he dictates their testimony. On December 14, 1997 (second call), Footman tells Boykins to have "George" (another prostitute named Graciela Cuevas) write a "letter" recanting any statement implicating him: "Why don't you see GEORGE and tell GEORGE to write that letter say I'm sorry, I had to lie cuz they threatened to look me back up. Signed ba ba ba ba." On December 14, 1997 (third call), he dictates to Boykins: "Man, you can go in there and tell them the whole, if they want to know, look, want, me to coach you on how to do it? You go in there and you tell them, how you went out there on your own, right." (The implication is that "out there" is Delaware.) Footman then goes on at length about the story that Boykins should tell the authorities.

By the next day, he changes his mind; he wants a different story. He directs a friend, Melissa, to communicate to Boykins:

---

**23.** As examples of factors which would make the girls "unusually" vulnerable, the government indicates that A.M. had nowhere to live apart from with the defendant's home; that Footman manipulated A.M. by fostering an emotional attachment to him; that S.O. had no permanent residence and was trying to get her daughter back, and Footman knew it; and that J–3 was a runaway.

**24.** § 3C1.1 provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

Footman: No! No! No! I told her something else last night on the phone. No, no, no, no, I told her to lie and tell them what they want to hear. But I might have fucked up by doing that because that might make the Feds take it. See what I'm saying and then I won't get out sooner than I was supposed to. See, I listen, alright, listen carefully, all right, if she goes in there and say what they want to hear. They want to hear that I drove them to work and that I, or I sent her to drive them to work, see what I'm saying. If she says that, it means that the Feds will take the case.

Melissa: So you don't want her to 'say that?

Footman: No! I want her to say that they paid me money, in Massachusetts that they paid me money, but they never, they never it wasn't like I was a real pimp it was like they sent me money cuz I asked for money. They gave me money. They can say they gave me money. I don't care about them givin' me money she can say all that.

Finally, there are real threats. In a conversation on November 24, 1997, to Solomon, apparently another pimp, Footman exclaimed, "I'm a pimp. Explain something to me man, why the fuck would you even attempt to try get that slanted eye bitch from me after that bitch done try to cross me up? What were you going to do, keep her and let her not go to court on me?" And then, "Well, where's that white bitch Tish at? Your brother got the whore. I'll make sure the whore don't come to court." And then, on December 6, 1997 (second call), in another conversation with Solomon, Solomon relates a conversation between two other pimps about the possibility of a prostitute, known to both, giving information about Footman. According to Solomon, one said "you can't motherfucking let this bitch [referring to Brubeck] go take the stand on my man [apparently Footman], you don't I'm gonna have to hurt this bitch". Footman seems to be sending a message to his "friends," to leave her alone because he wants Brubeck handled by "professionals," rather than his friends:

> I got my Peppy [another pimp] and them, know they're professionals, they know exactly what to do. I don't want nobody to get involved with these motherfuckers, then I'll be the one in trouble.

ADJUSTED OFFENSE LEVEL 18

### (2) Group 2: Count 1—Conspiracy, Count 4—Interstate Transportation of a Minor for Prostitution (Transportation of A.M. on or before 10/23/96)

Base Offense Level—U.S.S.G. § 2G1.2(a) **16**

Obstruction of Justice—U.S.S.G. § 3C1.1 **add 2**

Physical force—U.S.S.G. § 2G1.2(b) **add 4**

■ As noted above, a Mann Act offense is complete if the defendant caused a minor to be transported across state lines for the purpose of prostitution. *See* 18 U.S.C. § 2423. If more is involved—like force or coercion—then the Guidelines permit an upward adjustment. *See* U.S.S.G. § 2G1.2(b).

■ A.M. testified that after the August 1996, trip to Delaware, she had resolved to leave Footman and work in an escort service. Concerned that this would anger Footman, she sought, and obtained, a restraining order on September 3, 1996. She testified that on September 6, 1996, after she obtained the restraining order, she was dragged from her home, forced into a car with Footman and two other men, and brought to a bar where all of her money was taken. *See supra* Section I.A.

A.M. was vigorously cross examined by counsel for Footman—that she never pursued the restraining order, that she never pursued the assault and battery charges deriving from this incident at all, that in fact, she assured the Lynn District Court that Footman had not done anything to her.

For sentencing purposes, this Court is the fact finder. In my judgment, even under this intense cross examination, A.M. did not yield one inch. She insisted that she had sought the restraining order because Footman had threatened to kill her before, and that the events of September 1996 had occurred as she described them. She testified that she had backed away from the charges only because she was at once, afraid of him, but also thought she loved him. Finally, she stated that the reason she returned to his employ was, in a nutshell, because she simply had no place else to go.

The women victims in this case lived a tissue of lies—false names, birth dates, addresses. They lied to friends and family about what they were doing; they lied to the police and even the court. A.M. admitted to it all. But, her affect, the details she gave, the consistency of her story throughout her examination, led to a single conclusion. In the final analysis, I (and the jury) believed her.

ADJUSTED OFFENSE LEVEL 22

**(3) Group 3: Count 1—Conspiracy, Count 5—Interstate Transportation of a Minor for Prostitution (S.O.10/96), Counts 9–10—Interstate Facility with Intent to Distribute the Proceeds of a Business Enterprise Involving Prostitution.**

Base offense Level—U.S.S.G. § 2G1.2(a) **16**

Obstruction of Justice—U.S.S.G. § 3C1.1 **add 2**

ADJUSTED OFFENSE LEVEL 18 [25]

**(4) Group 4: Count 1—Conspiracy, Count 6—Interstate Transportation of Minor for Prostitution (J–3 October 1996), Counts 11–19—Use of Interstate Facility**

Base Offense Level—U.S.S.G. § 2G1.2(a) **16**

Offense characteristics (minor was fourteen years of age)— § 2G1.2(b)(3) **add 2**

Obstruction of Justice—U.S.S.G. § 3C1.1 **add 2**

ADJUSTED OFFENSE LEVEL 20

**(5) Group 5: Count 1—Conspiracy, Count 7—Interstate Transportation for Prostitution (Rita Boykins, March 1997)**

Base Offense Level—U.S.S.G. § 2G1.1 **14**

Obstruction of Justice—U.S.S.G. § 3C1.1 **add 2**

ADJUSTED OFFENSE LEVEL 16

Under the rules governing multiple count adjustments, *see* U.S.S.G. § 3D1.4, 4 levels are to be added to the highest offense level, yielding 26.

## IV. MOTION FOR UPWARD DEPARTURE

At the appropriate time, the government filed a motion for an upward departure based on the inadequacy of Footman's criminal history score under U.S.S.G. § 4A1.3, and the fact that the offense involved an abduction (paired with a rape,

---

**25.** The government argued that this episode should yield a higher score because of the victim's vulnerability and because J–3 was recruited and trained by A.M. who was less than 18. I have already addressed the issue of "vulnerability" above. With respect to the latter, § 3B1.4 provides:

If the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by 2 levels.

This adjustment suffers from the same problems as the government's argument on the application of the November 1, 1996 book. It is not at all clear when the J–3 trip took place relative to A.M.'s birthday. Accordingly, I will make no adjustment on this score.

and beating) under U.S.S.G. § 5K2.4. In effect, § 4A1.3 allows a "horizontal" departure by increasing the criminal history category where "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes," while U.S.S.G. § 5K2.4 allows a "vertical" departure to increase the offense level when the offense is accompanied by an abduction, or the unlawful restraint of an individual.

I will depart upward, both horizontally and vertically.

## A. *Criminal History*

### 1. Framework

The Commission, pursuant to its authority under the Sentencing Reform Act, determined that a defendant's "past criminal conduct"[26] is directly relevant to the purposes of sentencing: An individual "with a record of criminal behavior" is more culpable, it found, than a first offender. General deterrence requires that a message be sent that "repeated criminal behavior" will aggravate the punishment. Finally, such conduct is correlated with recidivism on the one hand, and the limited likelihood of rehabilitation on the other. U.S.S.G. § 4A1.1 attempts to identify those factors which correlate with these purposes.

The appropriate starting point for the analysis consists of those offenses which resulted in convictions. The score given a conviction depends upon the length of the sentence, and, to a degree, the circumstances of those convictions. U.S.S.G. § 4A1.1 outlines how those points are assigned: more points for sentences exceeding one year and one month, less for lesser sentences, and more points if the defendant committed the offense while under any criminal justice sentence, or less than two years after release from imprisonment.

At the same time, U.S.S.G. § 4A1.3, p.s. recognizes that the formal scoring system cannot be entirely adequate to the task. *See e.g., United States v. Leviner*, 31 F.Supp.2d 23, 31–34 (D.Mass.1998). If "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range." U.S.S.G. § 4A1.3, p.s.

The policy statement describes the kind of data that may be relevant to the court's determination of "adequacy." Again, there is a focus on convictions, and the circumstances surrounding them—in effect, asking the question—what is it about the score which created the under (or over) valuation of the record?: (i) prior sentences not counted in computing criminal history (e.g., foreign sentences), (ii) prior sentences of "substantially more than one year" that derive from independent crimes on different occasions, *see* § 4A1.3(a) and (b); (iii) the timing of convictions—did they follow closely one after another, or while another charge was pending, *see* U.S.S.G. § 4A1.3 (d); and (iv) the nature of the convictions,—e.g., assaultive behavior or non-violent conduct. *See Leviner*, 31 F.Supp.2d at 32–33.

▮▮▮ Significantly, the Guidelines also permit the court to go beyond the formalities of the conviction and sentence, to reexamine the sentences that the defendant has already received. Commentary to U.S.S.G. § 4A1.3 suggests that a court may second guess the sentences imposed by other courts, i.e., "a defendant with an extensive record of serious, assaultive conduct who had received what might now be considered extremely lenient treatment in the past might have the same criminal history category as a defendant who had a record of less serious conduct." This, as the drafters note, may be especially true of

---

**26.** U.S.S.G. Ch.4, Intro. Comment.

younger defendants who "may have received repeated lenient treatment, yet who may actually pose a greater risk of serious recidivism than older defendants."

Indeed, the language of these sections suggests that the court is permitted to go still further beyond the formalities of convictions and sentences altogether. U.S.S.G. § 4A1.3(e) permits the court to consider "prior similar adult criminal conduct not resulting in a criminal conviction," [27] so long as the information is "reliable." U.S.S.G. § 4A1.3 (Background).[28]

■ To be sure, just because the Guidelines seem to give a judge the discretion to look to criminal conduct rather than convictions, it does not mean that a judge should do so. Once one ventures past formal convictions, and formal sentences, one is in troubling territory. How can the court reconstruct prosecutions long past? Should the court essentially retry the past conduct, or rely on police reports which may well be skewed? And if a matter has been dismissed, or worse, resulted in an acquittal, how can the court, many years hence, substitute its judgment for that of the original decision-maker? [29]

27. Indeed, the language of § 4A1.3(e) mirrors the language of the "Introductory Commentary" to Part A—Criminal History. It addresses the relationship between "past criminal conduct" or "prior criminal behavior" and culpability, deterrence, and recidivism, not past convictions. At the same time, the policy statement notes that "a prior arrest record itself shall not be considered under § 4A1.3." Putting together the references to "past criminal conduct" or "behavior," with the reference to a "prior arrest record itself," suggests that a court cannot rely only on a prior arrest without any additional reliable information. Plainly, there are serious concerns about fairness when a judge extrapolates merely from an un-adjudicated, and un-challenged arrest record.

28. See United States v. Baird, 109 F.3d 856, 863–64 (3rd Cir.1997) (considering conduct underlying dismissed counts).

29. Those concerns are not unlike the concerns raised by some with respect to a court's considering, as relevant conduct, uncharged

■ To the extent that I based my original upward departure on "prior criminal conduct" that did not result in a conviction, I wish to reexamine it. I will first analyze Footman's record looking only at the convictions and the inferences that may be drawn from them.[30] Based on that reexamination alone, without more, I conclude that there is a substantial basis for departing upward three levels. I will address these issues in section (2) below.

At the same time, this case is unique in the amount of reliable information that I have with respect to Footman's record. I listened to the sworn testimony of a witness who, in response to defense questions, described the defendant's criminal conduct towards her, the charges she pressed against him, and why she did not go farther. She feared, she said, that he would kill her. I also listened to the defendant's own words in conversations with some of the women who worked for him, and other pimps, in which he talks about his record, and his intent to continue to commit crimes.

In effect, the Guidelines treat criminal convictions as providing circumstantial evidence of recidivism.[31] Courts seek to draw inferences about future conduct from past conduct, dismissed charges or worse, acquitted conduct. See United States v. Watts, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). In a sense, considering such conduct as criminal history is even more troubling— because of the problems in reconstructing events from some time ago, in perhaps other jurisdictions, with witnesses long gone and documents lost.

30. This is the approach I used in United States v. Leviner, 31 F.Supp.2d at 31–34.

31. Criminal convictions are circumstantial evidence of recidivism; to get from the fact of conviction to the likelihood of re-offending takes inferences. Criminal convictions are direct evidence of culpability, according to the Guidelines, since the Commission determined that an individual "with a record of criminal behavior" is more culpable than a first offender.

convictions. The inference that I have drawn from Footman's record is that recidivism is quite likely, indeed, more likely than the score suggests; and further, that his record undervalues his culpability.

Other testimony—about past criminal conduct, and the evidence from the defendant's own mouth—serve to corroborate the inferences I have already drawn. Indeed, the evidence in this case goes beyond circumstantial proof. The defendant's statements about his past, and his plans for the future comprise as close to direct evidence of the likelihood of recidivism as one is likely to find. He announces, in effect: I have committed illegal acts in the past and when I get out I will continue to do so!

I will address those facts in section (3) below.

### 2. Footman's Criminal History

Footman's Presentence Report assigns 5 criminal history points, amounting to a level III under the Guidelines.

### (a) Unscored Convictions

■■■ Footman's juvenile adjudications were not counted under § 4A1.2(e)(3) because they were over five years old.[32] Nevertheless, I can evaluate them in determining the adequacy of the score to reflect his criminal history. *United States v. Connolly,* 51 F.3d 1, 4 (1st Cir.1995)(affirming upward departure based on counting one conviction falling beyond 15–year cutoff period, where defendant had a substantial criminal career).

When Footman was sixteen years old, he had three delinquency adjudications—breaking and entering in the night time, larceny, and burglary. He was committed to the custody of the Department of Youth Services ("DYS") for the first offense, and received a suspended sentence for the next two. When Footman was seventeen, he was arrested for three more offenses—

carrying a weapon, attempted larceny, and assault with a dangerous weapon. For each, Footman received suspended sentences and probation. Shortly after he turned eighteen, and notwithstanding the breaks he had received on his earlier convictions, Footman committed an unarmed robbery. As a result, his probation was revoked, and he was incarcerated for six months until December 5, 1980. Within two months of his release, he committed another crime, larceny under $100 (shoplifting), and another probationary period was imposed until September 2, 1981. Six months later, and apparently while still on probation for the larceny under $100, he was convicted of unarmed robbery, fined, and again placed on probation, to run concurrent with the earlier one.

Three years later, July 16, 1984—he was now twenty-two years old—Footman was convicted of possession of mace and placed on probation until September 20, 1984. The following month, again while on probation, he was convicted of being a disorderly person.[33] For this offense, Footman was sentenced to six weeks in the house of correction and a default was entered on his earlier probation, which was extended until February 18, 1987.

There are twelve convictions here, in a six year period—from the time that Footman was sixteen until the time he was twenty-two—that were not scored. This record fits the profile included in the Guidelines, that of a juvenile offender who consistently received lenient treatment because of his age, but constantly re-offended, with the offenses escalating to assaults, and at least one weapons possession. *See* U.S.S.G. § 4A1.3, (Commentary); U.S.S.G. § 4A1.2, Application Note 8. It did not matter whether he was on probation, or indeed, if he had been in custody; he kept on committing crimes, including violent crimes.

---

**32.** The Guidelines score juvenile offenses depending upon the length of detention and the age of the sentence. *See* U.S.S.G. § 4A1.2(d)(2)(A) and (B).

**33.** This crime took place at the corner of Beach and Washington Streets.

### (b) Convictions within the Relevant Time Period

On December 5, 1985, a short time after his last incarceration, Footman committed an aggravated rape. He was convicted on February 12, 1986, and again received a suspended sentence and three years probation. Still, he could not be true to the terms of his probation. Over the next two years, he was convicted of three more offenses which apparently the trial court found to be minor—giving a false name to a police officer, disorderly person in Lowell District Court, and again in the Boston Municipal Court. His probation was never revoked on account of these offenses.

Then, on September 14, 1988, Footman was involved in something which finally triggered his imprisonment. On October 19, 1988, Footman was convicted of being a disorderly person, just as he had the previous year. But this time, his probation on the rape charge was revoked, and, in addition, he received a six month sentence "from and after" the rape sentence. Significantly, a charge of "assault and battery" was also dismissed on that date. Even if the assault charge had been dismissed because the evidence was inadequate for a criminal conviction, or as a result of a plea bargain, it is clear that whatever Footman had done, a court finally concluded that he had to be incarcerated.[34]

Footman went to MCI Cedar Junction and was released on April 14, 1993. Within two years of his release, he was convicted of obstructing a firefighter and received 10 days in the house of corrections.[35] Two years later, he was convicted of assault and battery, but the charges were filed.[36]

Therefore, from 1985 until 1997, he had seven convictions, and ominously, convictions for even more combative behavior, including aggravated rape. He received his first "real" time, a Cedar Junction state prison sentence, but it apparently had little or no effect on his resulting behavior. These patterns—without more—suggest that the Guideline score of five substantially undervalues Footman's culpability, and the likelihood that he would repeat his offenses. *See* U.S.S.G. § 4A1.3.

### 3. Additional Information

### (a) The Defendant's Words:

While it may be troubling for courts to extrapolate from the cold record and draw inferences about what "really" happened, this case may well be different. However one interprets the criminal record, there is no mistaking the defendant's words. On the MCI Concord tapes he brags to another pimp (on November 24, 1997):

FOOTMAN: Let me tell you something man, I'm nine and 0 in the court system, right?

SOLOMON: Ah-hun.

FOOTMAN: I'm gonna be ten and 0 in that court system. They can blow this shit up all they want. They ain't got no whores testifying or doing anything.

SOLOMON: Yeah.

FOOTMAN: When the trial comes, ain't no bitch gonna get in my face and lie on me, understand what I'm saying. So I'm gonna be out. I'll sit

---

34. The presentence report recounted the contents of a police report having to do with the assault and battery. Because of my concerns about evaluating a report involving a dismissed charge, the only inference I am prepared to draw is the one described above—that the incident that occurred on September 14, 1988, (which led to assault and battery charges, and a disorderly person charge) was somehow serious enough to trigger a revocation of probation and a consecutive sentence.

35. Consistent with § 4A1.2(c)(1), probation did not score this offense.

36. Probation did score this offense, under § 4A1.1(c), and the authority of *United States v. Pierce,* 60 F.3d 886 (1st Cir.1995).

for a year, year and a half, that's all it's gonna be.

And then, lest there be any mistake that this is a conversation about what he got away with and what he plans to return to, Footman says (again to Solomon):

SOLOMON: ... How are you doing?

FOOTMAN: I'm doing alright. The pimp will be home real soon and we'll pimp up, again.

SOLOMON: That's all good. That's what you got to do. I'm just saying what's up.

FOOTMAN: I'm a pimp... [37]

From 1980 through 1995, the record is consistent with Footman's boast—"9 and 0." There are a number of charges that were dismissed, or for which the defendant was found not guilty, including common night-walking charges, and rape. While, his 9-0 reference could, of course, suggest either that he was wrongfully targeted by the police, which is not unimaginable, or it could mean that he regularly "beat the rap" even when guilty. Footman's announcement that he is a pimp and that he "will be home real soon and ... pimp up again," and the fact the defendant reported to probation that he "was never out of jail long enough to get a job,"—strongly suggests the latter.

**(b) The Trial Testimony**

It was defense counsel who brought out information concerning certain charges brought by A.M. against Footman that resulted in a dismissal or a not guilty verdict. It was done in an effort to show that A.M. was lying in her accusations against Footman, about Footman's threatening her, intimidating her, taking prostitution proceeds from her. The testimony had the opposite effect on this Court. In fact, based on A.M.'s testimony and her demeanor, I believed that the underlying charges were true. I concluded that she

did not pursue them because she was frightened.

A.M. was the victim in a January 1995 charge brought against Footman for Deriving Support from a Minor Prostitute. Footman was detained pretrial. While detained, A.M. brought charges of intimidation against him, and sought a restraining order. When both the prostitution and the intimidation cases came to court, as well as the restraining order, A.M. refused to testify. It was not, as the defense suggested, because the charges were not true. Rather, it was because she both feared Footman would kill her, and believed she loved him. When asked, "as a result of that [your not testifying], he was found not guilty right," A.M. replied "yes." Footman, in short, "beat this rap," not because he was innocent, but because he had intimidated A.M. into not showing up.

Within a month of Footman's release from detention, A.M. testified that he sent her to Delaware to continue her prostitution activities.

**4. Degree of Departure**

By any measure, Footman's criminal history score understates his culpability and the strong likelihood of his recidivism. Footman has had repeated encounters with the criminal justice system since he was eighteen years of age to the present—age thirty-four. He was repeatedly imprisoned—in MCI Cedar Junction and in the House of Corrections—but his record has not abated. In fact, if anything, the record has grown more violent. By his own words, Footman suggested that he had the benefit of one lenient disposition after another, and the failure of witnesses to appear to testify against him, like A.M.

In calculating the appropriate criminal history category, to depart to, I could try to count the unscored convictions as adding multiple criminal history points to the

**37.** Indeed, the conversation seems to be about trying to make certain that other pimps do not "take" the women working for him.

five he has. (There were fifteen unscored convictions).[38] I could speculate how close Footman has come to being treated as a career criminal under § 4B1.1. All he needed was one more conviction of a crime of violence before the instant offense: If his conviction for unarmed robbery on June 16, 1980, or July 6, 1981 had occurred later, if the violent offense which he committed after these offenses had been committed before,[39] if only one of the "9–0" record which he gloats about had resulted in a conviction for a crime of violence—any of these could have triggered the career criminal designation. But district courts are not required "to go through such a 'ritualistic' exercise of expressly examining each intervening criminal history category." *See United States v. Ashburn,* 38 F.3d 803, 809 (5th Cir.1994). Thus, in my judgment, and based on the discussion above, I find an upward departure is warranted to a level VI.

### B. *Abduction*

■■■ Under U.S.S.G. § 5K2.4, the court is entitled to depart upward "[i]f a person was abducted, taken hostage or unlawfully restrained to facilitate commission of the offense."

Two incidents meet this description:

#### (1) S.O.

S.O. testified that Footman came after her when she began to work for another pimp in mid November, that he took her back to his room, beat her with anything in sight, and raped her vaginally and anally. *See* Section I.B. He tried to take her back to Boston but she escaped with one of the truck drivers. She returned to the truck

stop, with her old pimp, who insisted she continue to work, but the pain prevented her. The second night after the rape, she stopped breathing, and someone called an ambulance. She refused to go. The following night she passed out again. She was finally admitted to a hospital a week and half later. She ¬repeated her account to Sgt. Border of the Delaware police. And it was corroborated by the testimony of Connie Smith, the manager of the Budget Motel Lodge, who testified that she recalled an incident in the fall of 1996 when a woman named "Sara Olson" (an alias of Ms. S.O.) came running into the office of the Budge Motor Lodge—her hair messed up, her face, red, her affect, frightened.

Again, cross examination was vigorous. When defense counsel repeatedly challenged her as to the fact of the rape, she broke down, sobbing.[40]

I believed her account.

#### (2) A.M.

A.M. testified that in mid-January of 1997, she left with a trucker named Curtis Roman. She finally returned about the end of February 1997, with another pimp. Footman found her, took her to his room and beat her up. *See* Section I.A. A.M. *returned to the truck plaza, bloody and battered.*

I believed A.M.

Under the circumstances, I depart upward three levels, from 26 to 29. There was an abduction under U.S.S.G. § 5K2.4.[41]

**38.** Although this number includes three convictions—7/3/87—True Name; 8/6/87—Disorderly Person; 10/14/87—Disorderly Person—which could not be scored because of the disposition, they do illustrate the fact that the defendant was simply unable to follow the terms of his probation.

**39.** The January 19, 1997, conviction for assault and battery, for which he was convicted occurred after these offense and thus cannot

be the basis for an armed career criminal status.

**40.** A.M. confirmed S.O.'s story. Rita Boykins did not. In fact, S.O. does not put Boykins at the scene of the beating.

**41.** I did not consider the abduction of A.M. that had occurred in September 1996. That abduction had been counted before in my analysis of offense conduct.

## V. CONCLUSION

Accordingly, I sentence Footman to 180 months: 120 months on each of the counts 3–6 to be served concurrently with each other; 60 months on count 1, to be served consecutively with the sentence imposed on counts 3–6, and 30 months on each of the counts 7, 8–19 to be served concurrently with the sentence imposed on count 1.

**SO ORDERED.**